PD-0138&0139-17
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/27/2017 2:35:13 PM
Accepted 3/28/2017 3:08:01 PM
ABEL ACOSTA
CLERK

CAUSE NO. PD-0138-17
CAUSE NO. PD-0139-17

_____

THE COURT OF CRIMINAL APPEALS OF TEXAS

_____

**MICHELE MARIE WILLIAMS, Petitioner**

**VS.**

**THE STATE OF TEXAS, Respondent**

_____

On Appeal from the Court of Appeals for the Second District of Texas at Fort Worth
(Court of Appeals Cause Number 02-14-00413-CR)
On Appeal from the 396th District Court of Tarrant County, Texas
(Trial Court Cause No. 1266846D)

On Appeal from the Court of Appeals for the Second District of Texas at Fort Worth
(Court of Appeals Cause Number 02-14-00414-CR)
On Appeal from the 396th District Court of Tarrant County, Texas
(Trial Court Cause No. 1266847D)

_____

PETITION FOR DISCRETIONARY REVIEW

_____

Mike Berger
Attorney at Law
State Bar No. 02191900
Office (817) 338-1500
Fax (817) 338-1505
Attorney for Petitioner

FILED IN
COURT OF CRIMINAL APPEALS

March 28, 2017

ABEL ACOSTA, CLERK

i

Identity of Parties and Counsel

**Parties to the Appeal:**

The State of Texas

Michele Marie Williams Jr.

**Names and Addresses of Trial Counsel**:

The Hon. Cody Cofer
Attorney at Law
111 N. Houston, No. 222
Fort Worth, Texas 76102

The Hon. A. Clay Graham
Attorney at Law
5719 Airport Freeway
Fort Worth, Texas

The Hon. Jack Strickland
The Hon. Sheila Wynn
Assistant Criminal D.A.'s
401 W. Belknap
Fort Worth, Texas 76119

**Names and Addresses of Appellate Counsel**:

The Hon. Mike Berger
Attorney at Law
933 W. Weatherford St. #200
Fort Worth, Texas 76102

The Hon. Debra Windsor
Assistant Criminal D.A.
401 W. Belknap
Fort Worth, Texas 76119

The Hon. Stacey M. Soule'
State Prosecuting Attorney
P.O. Box 12405
Austin, Texas 78711

Table of Contents

Identity of Parties and Counsel…………………………………………………… ii, iii

Appendix …………………………………………………………………….. iii

Table of Contents……………………………………………………………. iii

Index of Authorities…………………………………………………………… iv

Rules, Codes, Constitutions and Statutes ………………………………….. v

Statement Regarding Oral Argument…………………………………………… vi

Statement of the Case………………………………………………………… vii

Statement of Procedural History……………………………………………… viii

References to the Record……………………………………………………… 1, 2

Grounds for Review…………………………………………………………….. 2

Reasons for Review…………………………………………………………… 2

First Ground of Review (Restated) ………………………………………….. 3

Prayer for Relief ……………………………………………………………… 11

Certificate of Service …………………………………………………………. 12

Certificate of Compliance …………………………………………………….. 13

Appendix

Court of Appeals' December 22nd, 2016 Opinion

Court of Appeals' January 26th, 2017 Order Denying Appellant's Motion for En Banc Consideration and Motion for Rehearing

Index of Authorities

RULES, CODES, CONSTITUTIONS AND STATUTES

**Cases**

*Dowthitt v. State*,
931 S.W.2d 244(Tex.Crim. App. 1996)……………………………………. 4, 5 , 8

*Ervin v. State*,
333 S.W.3d 187 (Tex. App. - Houston [1st Dist.] 2010)………………….. 9

*Estrada v. State*,
313 S.W.3d 274 (Tex. Crim. App. 2010), cert. denied,
562 U.S. 1142 (2011)……………………………………………………. 4

*Gardner v. State*,
306 S.W.3d 274 (Tex.Crim.App.2009)……………………………………….. 9

*Miranda v. Arizona*,
384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)……………………… 7, 10

*Montejo v. Louisiana*,
556 U.S. 778, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009)…………………… 7

*Pecina v. State*,
361 S.W.3d 68 (Tex.Crim.App. - 2012)…………………………………….. 7

*Stansbury v. California*,
511 U.S. 318, 114 S. Ct. 1526 (1994)……………………………………… 4

*State v. Howard*,
378 S.W.3d 535 (Tex. App. - Fort Worth 2012, pet. ref'd)…………………  6

*Wilson v. State*,
442 S.W.3d 779 (Tex. App. - Fort Worth 2014, pet. ref'd), cert. denied,
136 S. Ct. 86 (2015)………………………………………………………  4, 10

**<u>Rules</u>**

TEX.R.APP.P 66.3(b)……………………………………………………….  2

TEX.R.APP.P 66.3(c)……………………………………………………….  2

TEX.R.APP.P. 66.3(e)……………………………………………………....  2

**<u>Statutes</u>**

TEX.PEN.CODE. §19.02 (b)(1)……………………………………………..  vii

TEX.PEN.CODE. §37.09………………………………………………………  vii

U.S. CONST. amend. V……………………………………………………….  7

## Statement Regarding Oral Argument

Oral argument is waived.

## Statement of the Case

The Appellant was indicted on June 26th, 2012 in Cause Number 1266846D alleging a charge of murder pursuant to TEX.PEN.CODE. §19.02 (b)(1), (CR 1 at 8-9), and in Cause Number 1266847, alleging a charge of Tampering with Physical Evidence pursuant to TEX.PEN.CODE. §37.09. (CR 1 at 6-7). On September 22nd, 2014 the case was called to a jury trial. (CR 1 at 9). The jury returned a verdict of guilty in Cause Number 1266846D and Count Two of Cause Number 1266847D on September 29th, 2014, and sentenced the Appellant to 60 and 10 years' incarceration respectively in the Institutional Division of the Texas Department of Corrections. (CR 1 at 276-277, CR 1 at 85-86). Notice of Appeal was filed on September 30th, 2014, and a motion for a new trial was filed on October 15th, 2014. (CR 1 at 282, 302, CR 1 at 91, 107).

## Statement of Procedural History

(1) On December 22nd, 2016, the Second Court of Appeals affirmed Petitioner's convictions.

(2) Petitioner filed a Motion for En Banc Reconsideration and a Motion for Rehearing on January 6th, 2017. The Second Court of Appeals denied both the Petitioner's Motion for En Banc Reconsideration and a Motion for Rehearing on January 26th, 2017.

CAUSE NO. PD-0138-17
CAUSE NO. PD-0139-17
_____

THE COURT OF CRIMINAL APPEALS OF TEXAS
_____

**MICHELE MARIE WILLIAMS, Petitioner**

**VS.**

**THE STATE OF TEXAS, Respondent**
_____

TO THE HONORABLE COURT OF CRIMINAL APPEALS OF TEXAS:

Petitioner, Michele Marie Williams, respectfully submits this petition for discretionary review in the above styled and numbered causes.

## References to the Record

References to the Clerk's Record in 02-14-00413-CR and 02-14-00414-CR are designated as "(CR 413/page number or CR 414/page number)." This is the appeal of both convictions. This appeal addresses the issue concerning the Keller Police Department's detention and interrogation of the Appellant at the police station minutes after the murder of her husband, and the continued questioning after she had requested the assistance of a lawyer. References to the Reporter's Record are designated as "(RR volume number (1-12)/page number)." Because the two appeals are related, the court can use the records from both. *Guzman v.*

1

*State*, 732 S.W.2d 683, 686 n.2 (Tex. App. - Corpus Christi 1987, no pet.) (per curiam).

## GROUNDS FOR REVIEW

### First Ground of Review

*The Court of Appeals erred in concluding that that the trial court did not abuse its discretion in finding that the Petitioner was never taken into custody, and that the Keller Police Department were not obligated to accede to the Petitioner's request for counsel during her interrogation.*

## REASONS FOR REVIEW

Regarding law enforcement's refusal to permit the Petitioner to speak to an attorney during her interrogation, the Petitioner argues that an important question of state law should be conclusively settled by this Court. TEX.R.APP.P 66.3(b). Petitioner believes that the lower court's interpretation of the applicability of a federal case is in conflict with the Court of Criminal Appeals. TEX.R.APP.P 66.3(c). Finally, the petitioner contends the court of appeals has so far departed from the accepted and usual course of judicial proceedings, or so far sanctioned such a departure by a lower court, as to call for an exercise of the Court of Criminal Appeals' power of supervision. TEX.R.APP.P. 66.3(f).

<u>First Ground of Review (Restated)</u>

*The Court of Appeals erred in concluding that that the trial court did not abuse its discretion in finding that the Petitioner was never taken into custody, and that the Keller Police Department were not obligated to accede to the Petitioner's request for counsel during her interrogation.*

The Petitioner is requesting that this court review the lower court's finding that she was never taken into custody nor did she have the right to request the advice of counsel. The Petitioner's argument is that for all intents and purposes, she was in fact in custody or transitioned into custody from the moment she was "asked" to accompany police officers to the Keller Police Station. The second part of this argument suggests that the lower court reached the disturbing conclusion that suspects are not permitted to request the services of an attorney if they are not "objectively" in custody.

Petitioner disputes the lower court's finding that she had "she had voluntarily agreed to accompany Sergeant McGrew and Officer Todd to the police station" (Mem.Opin. p.20). This conclusion is reached however on the faulty premise that an "agreement" to accompany law enforcement to the police station can be described as "voluntary" when there is no reasonable alternative, especially when that agreement to accompany police is under a cloud of suspicion that has not yet been communicated to the suspect.

3

The background to this agreement needs to be reiterated. As was emphasized in the Petitioner's brief, police officers had taken her cell phone, her car keys and her purse, and she could not return to her home as it was a crime scene. Her agreement therefore to accompany the police officers looks less like a choice and more akin to a submission to the authority of law enforcement. But even assuming that her agreement to accompany police to the station house was not initially coercive on its face, there is still the troubling circumstance that once she arrived at the station she was not told she could leave and she was not permitted to call an attorney.

The lower court first conducted an analysis which correctly tracked the case law but arguably failed to consider the context of the Petitioner's trip to the station house or what occurred there once she arrived:

"Custodial interrogation occurs when law enforcement officers question a person after taking him into custody or depriving him of his freedom of action in any significant way. *Wilson v. State*, 442 S.W.3d 779, 784 (Tex. App. - Fort Worth 2014, pet. ref'd), cert. denied, 136 S. Ct. 86 (2015). A court must examine all of the circumstances surrounding the interrogation when determining whether someone is in custody; however, the ultimate inquiry is simply whether there was a formal arrest or restraint on the freedom of movement of the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1529 (1994); *Estrada v. State*, 313 S.W.3d 274, 294 (Tex. Crim. App. 2010), cert. denied, 562 U.S. 1142 (2011); *Dowthitt v. State*, 931 S.W.2d 244, 254-55 (Tex.Crim. App. 1996).

Four scenarios wherein a person might be deemed in custody are:
(1) when the person is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the person he cannot leave, (3) when law enforcement officers create a situation that would lead a

4

reasonable person to believe his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the person he is free to leave. *Dowthitt*, 931 S.W.2d at 255." (Mem.Opin. p.18-19).

The Petitioner's claim argues that all of the four conditions that suggest that a person might be deemed in custody were to one degree or another met in this case. Petitioner's position here is that scenario one and three are overwhelmingly in favor of the proposition that she was in custody. Although the case law is clear that the reasonable person/objective standard determines whether or not custody has attached, the lower court's general analysis focused solely on the Petitioner's status in terms of a literal deprivation of freedom – ie. the suspect is "patted down, handcuffed or otherwise restrained". Petitioner would argue that lower court's interpretation of the term custody is overly narrow in the sense that a suspect, if not beaten, handcuffed and bound to a chair, could never in a true sense be constrained of her freedom. The language in *Dowthitt* qualifies the deprivation of freedom with the phrase "in any significant way", or as a "restraint on the freedom of movement of the degree associated with a formal arrest". This phrase is important because the circumstances leading up to the Petitioner's transportation to the station house were not truly voluntary. More pertinent is the illusion that suspects are expected to hew to a "reasonable" perception of what constitutes custody as opposed to the "subjective" and therefore invalid perception of their own circumstance.

5

One of the first things that happened in this investigation was that the Petitioner's cell phone was confiscated by a uniformed officer. McGrew told the Petitioner that it had been taken from her because there was blood on it, but no evidence emerged at trial to actually bolster that claim. The salient factor was that her phone was confiscated en route to the station house and her ability to instantly communicate with the outside world (and an attorney) was terminated. Without dwelling on the specifics, the pivotal assertion of the Petitioner argument is reflected on the videotaped interrogation when the Petitioner is granted a bathroom break. This is crucial to the Petitioner's argument because the lower court asserted that she was free to leave the station at any time.

"Although she was free to walk out of the police station and the officers would have had to allow her to leave unimpeded, the police officers were not obligated to accede to any request for a lawyer at the time she suggested she might need a lawyer. At that point, because the record reflects she was free to leave, even if she had unambiguously requested counsel, Sergeant McGrew could have ignored her request and proceeded. *See State v. Howard*, 378 S.W.3d 535, 540-41 (Tex. App. - Fort Worth 2012, pet. ref'd). (Mem.Op. p.27).

The court's logic is quite disturbing. The lower court states that she was free to walk out of the station unimpeded[1] and that Sergeant McGrew could have ignored her request for an attorney and proceeded with the interview – something

_____

[1] "After Sergeant McGrew leaves the room, Appellant appears to mumble sobbingly, "I just want to leave." Officer Todd and Appellant then have a muted conversation about numbers they can call to have someone pick Appellant up. Appellant laments that she does not know where she can go, and Officer Todd tells Appellant that she cannot go home right now." (Mem.Op. p.22). The court then explains the context of that interaction.

which the court fails to appreciate that he did anyway. Moreover, the court's language states that her request for counsel was not unambiguous, implying that it was not clear enough anyway to have stopped the interview. In this sense, the lower court's opinion suggests that even if it was unambiguous, McGrew could have "ignored her request" because she was free to leave.

"Thus, in *Montejo*, the Supreme Court stated that, under its Fifth Amendment jurisprudence, "a defendant who does not want to speak to the police without counsel present need only say as much when he is first approached and given the *Miranda* warnings." And if he does invoke his Fifth Amendment right to counsel, "not only must the immediate contact [by police] end, but ' badgering' by later requests is prohibited." *Pecina v. State*, 361 S.W.3d 68, 76 (Tex.Crim.App. - 2012).

But what if McGrew deliberately withheld the Miranda warnings? If the interrogating officer consciously decides not to read the *Miranda* warnings under the correct assumption that it could halt the proceedings, the suspect's right to counsel is summarily denied because the officer has delayed the warning and as the lower court has decided, "she is free to walk out of the building". The problem is that the Petitioner did not know that she had that right, McGrew knew that she did not know her rights (he hadn't told her after all), and the lower court concluded that she was never at any time, in any sense, in custody. Simply put however, the lower court's assertion that she was free to leave is not only wrong, it is belied by the video recording in which Officer Todd accompanies her to the bathroom. If she was not free to take a bathroom break (or to change into a different set of clothes)

7

without an officer with her at all times, why would the Petitioner have felt free to leave the station? The *Dowthitt* case specifically and pointedly references this scenario:

"Moreover, law enforcement agents apparently ignored two requests by appellant to see his wife. While these actions may have merely been oversights, as Hidalgo and appellant became caught up in conversation (and later in addressing a potential medical emergency), they also constitute circumstances to be considered. The fact that appellant was accompanied during restroom breaks, although given an innocuous explanation, is also to be considered. (*emphasis added*), *Dowthitt* v. State, 931 S.W.2d 244, 256 (1996).

The Petitioner couldn't take a bathroom break or change clothes without an officer present much less have the right to call an attorney, but she was supposed to know that she could walk out of the station house?

Scenario four also supports the Petitioner's claims that there was probable cause to arrest her and Sergeant McGrew did not tell her she could leave. The lower court actually describes and places an ongoing timeline on the probable cause that had emerged at the outset of the interrogation:

"For approximately the next hour and fifty minutes, Sergeant McGrew communicates to Appellant that the information that he is getting from the officers at the scene does not support what she had told him and that, based upon his experience, one of two things happened. Sergeant McGrew tells Appellant that either Gregory committed suicide and she tried to cover it up or that she killed Gregory." (Mem.Opin. p.18-19).

Sergeant McGrew knew from the first glance at the crime scene that the weapon had been moved and that crime scene had been disturbed. McGrew also had the Petitioner tested for gunshot residue on her hands upon her arrival at the

8

stationhouse, and had her change into different clothing taken from her residence by another officer. McGrew therefore himself established the indicia for probable cause for an arrest for tampering with the evidence and did not tell the Petitioner that she was free to leave the station.

"He denied telling her she was not free to leave, but he also denied expressly telling her she was free to leave." (Mem.Opin. p.21).

In plain English this means that he didn't say she could go, and he didn't say she could leave. In other words, would a reasonable person in the Petitioner's situation taken that as a cue to stay or march out? This kind of ambiguity should not favor the State. If she had a right to leave, then McGrew had an obligation to tell her. But this is the detective who shouted over her request for a lawyer and kept the interrogation going long after she had invoked the right to counsel. McGrew needed her to keep talking and for her to understand that he was in total control of the situation.

"The fourth category applies only when the officer's knowledge of probable cause is communicated to the suspect or by the suspect to the officer; even then custody is established only "if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Gardner*, 306 S.W.3d at 295 n. 48. *Ervin v. State*, 333 S.W.3d 187, 205 (Tex. App. - Houston [1st Dist.] 2010).

Petitioner's argument is overall based on the cumulative actions of the Keller Police Department, specifically the testimony that the McGrew knew from minute of the investigation that the placement of the weapon ruled out a suicide if

9

the crime scene had been untouched, and made tampering with the evidence absolutely conclusive if a suicide had in fact taken place. McGrew actions in taking the Petitioner to the stationhouse in conjunction with his line of questioning are clear proof that he had the necessary probable cause for an arrest for tampering with evidence and that he deliberately withheld that fact so that he could adhere to the legal fiction that she was still a "witness" or a "victim". As is mentioned in the *Seibert* case, McGrew's tactics were text book examples of avoiding giving the Petitioner her *Miranda* rights until after a confession had been obtained, a charade that Justice Meier called a "rhetorical circumvention of *Miranda* and its progeny." *Wilson v. State*, 442 S.W.3d 779, 788 (Tex.App. - Fort Worth 2014).

Prayer


Wherefore, premises considered, Petitioner prays that the Court grant his petition for discretionary review, order additional briefing, reverse the court of appeals' judgment and: (1) remand the cause for a new trial in both cause numbers; (2) suppress the videotape interrogation in its entirety or after the point in which requests an attorney; and/or (4) remand the cause to the court of appeals for further proceedings consistent with this Court's opinion. Petitioner further prays for all other relief to which she may be entitled.


Respectfully submitted,

/s/ Mike Berger
michaelidf@aol.com
933 Weatherford #200
Fort Worth, Texas 76102
817/338-1500
817/338-1505 (fax)
SBOT # 02191900

## Certificate of Service

I certify a true and correct copy of this Petition was sent on March 27th, 2017, by first class U. S. Mail, postage prepaid, to:

Stacey M. Soule'
State Prosecuting Attorney
P.O. Box 12405
Austin, Texas 78711.

Debra Windsor, ADA
Appellate Section
District Attorney's Office
401 West Belknap
Fort Worth, Texas 76196

I certify the original and ten true and correct copies of this Petition were sent on March 27th, 2017, by first class Mail, postage prepaid, to:

Court of Criminal Appeals of Texas
Capital Station
201 W. 14th St. - P.O. Box 12308
Austin, TX 78711

/s/ Mike Berger
michaelidf@aol.com
933 Weatherford #200
Fort Worth, Texas 76102
817/338-1500
817/338-1505 (fax)
SBOT # 02191900

## Certificate of Compliance

I hereby certify that the above-referenced Petition for Discretionary Review is in compliance with TEX.R.APP.P. 9 (i)(2)(d) in that it is 2,669 words long (as per Microsoft Word®).



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00413-CR

| | | |
|---|---|---|
| Michele Marie Williams | § | From the 396th District Court |
| | § | of Tarrant County (1266846D) |
| v. | § | December 22, 2016 |
| | § | Opinion by Justice Gardner |
| The State of Texas | § | (p) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS


By _/s/ Anne Gardner_____
Justice Anne Gardner



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00413-CR
### NO. 02-14-00414-CR

MICHELE MARIE WILLIAMS              APPELLANT

V.

THE STATE OF TEXAS                 STATE

----------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 1266846D, 1266847D

----------

## OPINION

----------

A jury found Appellant Michele Marie Williams guilty of murder and assessed her punishment at sixty years' incarceration in the penitentiary.[1] Tex. Penal Code Ann. § 19.02(b)(1) (West 2011). In a companion case, the jury found Appellant guilty of tampering with physical evidence and assessed her

---

[1]Trial court cause number 1266846D (02-14-00413-CR).

punishment at ten years' incarceration in the penitentiary.[2]  *Id.* § 37.09 (West Supp. 2016).  The trial court sentenced Appellant accordingly and ordered the sentences to run concurrently.  In three points, Appellant contends that (1) the trial court erred in admitting her oral and written statements into evidence, (2) the guilty verdict for murder was not supported by the evidence, and (3) the trial court violated her right to confrontation by allowing a medical examiner to testify regarding an autopsy that the medical examiner did not personally perform.  We affirm.

## STATEMENT OF FACTS

*Gregory Williams Looks Forward to His Dream House*

In the fall of 2011, Gregory Williams lived on Jacob Lane in Keller, Texas, with Appellant (his wife) and their four-year-old daughter, M.W.  Their house was inside a gated community.

In late September 2011, Gregory's mother described him as tired from working long hours but otherwise "peppy" and "energetic."  She further described Gregory as "very happy," "bubbly," and "excited" about the new house they were buying.  Gregory was trying to design a built-in aquarium and a swimming pool just for their daughter.  Gregory's mother described the new house as "kind of his dream house."

---

[2]Trial court cause number 1266847D (02-14-00414-CR).

2

*Gregory Is Shot and Killed; Appellant Calls 9-1-1 Regarding an Intruder*

On October 13, 2011, around 4:40 a.m., the Keller police received a 9-1-1 dispatch to go to the Williamses' home regarding an intruder who had shot a woman's husband and who was still in the home. The police had an Opticom device that enabled them to get past the gates.

When the police arrived, they saw Appellant on the front porch distraught, crying, and talking on her cellular telephone. She had a large contusion or swelling on her face that was starting to bruise. Appellant informed the officers that her husband was in the bedroom and their daughter was on the couch in the living room. She told the police that the intruder had run out the back door. Appellant described the intruder as a male in dark clothing.

Concerned that a threat could still be inside, three officers entered the house to make sure no one was still there. They found Gregory in the master bedroom. He was lying on the bed under the covers with blood on his head; blood was also on the floor. The bedroom television was blaring so loudly that one of the officers commented that he did not even attempt to talk over it; the officer found that very odd. The police observed a gun, shell casings, and a large wrench in close proximity to one another by the back door of the master bedroom that led to the backyard. Appellant told the police that the intruder ran out that door.

Still concerned about a possible threat, the police searched the backyard, which was enclosed by a fence. The police found no evidence of an intruder in

the backyard.  The door leading from the family room to the backyard was slightly ajar.  In the backyard, the police noted that there were no broken windows or doors.  The locks on the gates were not disturbed.  The area outside the fenced area showed no signs of forced entry or attempted forced entry.

After searching the house, the police concluded there was no intruder still there.  The police found M.W. asleep on a couch in the living room.

Appellant and M.W. went to an ambulance parked down the street.  Appellant received an icepack for the contusion on her face.

*The Police Process the Scene*

One of the officers began processing the crime scene on the assumption that an intruder had entered the residence.  He first inspected the outside of the residence and did not notice any damage or anything of an evidentiary nature.  Within the area enclosed by the fencing, however, he discovered a flathead screwdriver on the ground a few feet from the master bedroom door leading to the backyard and scratch marks on the outside of that door, indicating the use of a tool to attempt entry into the house.  He also collected a plastic bottle of Clorox wipes that he believed had been used to alter the crime scene.  The officer explained that disinfecting wipes would destroy any DNA evidence and fingerprints.  The Clorox wipes could have been used to wipe down the firearm recovered at the scene and to remove any traces of DNA and fingerprints.  He also testified that the flathead screwdriver blade matched the marks found on one of the doors leading to the backyard of the house.  However, the damage to

4

the doorframe was superficial; both the deadbolt and the doorknob were still functional. If someone had tried to pry open the door using the screwdriver, it did not work. It was also possible someone simply tried to alter the crime scene.

The canine officers from both Bedford and Keller responded. The canine searches produced no evidence of any intruder.

The police also went door to door in the neighborhood to determine if any of the Williamses' neighbors had seen anything suspicious. Their efforts turned up no information or evidence of any intruder.

*The Police Interview Appellant; She Asserts Gregory Committed Suicide and She Tampered with the Scene to Show He Was Killed During a Burglary*

Sergeant John McGrew asked Appellant if she would accompany him to the Keller police station for an interview so that the police could get a better understanding of what had occurred and more information about the intruder. Sergeant McGrew testified that Appellant was cooperative and willing to continue the interview. He described her as in pain and as having an ice pack on her face, but he denied that she appeared woozy. Sergeant McGrew did not consider her to be a suspect. If he had, he said he would have searched her and placed her in handcuffs.

Sergeant McGrew drove Appellant and Officer Bethany Todd to the police station, where they went to an interview room. Pursuant to normal procedure, Appellant changed her clothes so that the police could test them to see if the

5

intruder had transferred any evidence to them. Sergeant McGrew also swabbed Appellant's hands to check for gunshot residue or blowback.

Sergeant McGrew and Officer Todd explained the interview process to Appellant. Including bathroom and refreshment breaks, the interview lasted about five hours. The officers did not threaten Appellant during the interview and never indicated that she was not free to leave; Sergeant McGrew testified that if Appellant had asked to leave, she would have been permitted to leave. Appellant did not, however, ever request to leave the interview.

During her interview, Appellant admitted tampering with the crime scene. Sergeant McGrew asked Appellant to write out a statement in her own words and advised her of her *Miranda*[3] rights. The form on which Appellant wrote her statement contains a recitation of the *Miranda* rights, and she signed the form. Sergeant McGrew left the interview room while she wrote her statement.

Appellant's statement reads as follows:

> I went to sleep at 1:00 a.m.[,] and Gregg was still awake. He just took at least 3 Tylenol PM. About 3:00 a.m.[,] [M.W.] came to our room. I got up and [lay] down on the couch with her. Gregg was still awake. I asked him if he needed anything[,] and he said[,] "[J]ust to be left alone. I don't feel good." I fell asleep on the couch with [M.W.] and was [awakened] by a [gunshot] sound after 4 a.m. I ran to the bedroom and saw Gregg had shot himself in the head. I panicked and wanted to protect [M.W.] from ever knowing her daddy killed himself and started to clean things up. First[,] I wiped his right hand with Clorox wipes and dried it with a blanket and toilet paper, then wiped the gun with the blanket and toilet paper and moved the gun to the floor by the back door, opened the back door[,] and called

---

[3] *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

6

> 911—hoping to save his life and make it appear as a burglary. Then I went to the laundry room, got a screwdriver[,] and pried a little on the back door by my office and left it ajar. Then I grabbed the wrench[,] which was in the laundry room[,] and hit my right cheek to bruise it so it would appear as if I startled the [burglar]. I dropped it by the door in the bedroom and tossed the screwdriver out the door by the woodpile. I flushed all the toilet paper and Clorox wipes down the toilet. This entire time [M.W.] was still asleep. I didn't want his children to ever know he killed himself.

Sergeant McGrew testified that Appellant's suicide story negated her intruder story and that her statement acknowledged that she tampered with the crime scene. After finishing her statement and interview, Appellant left the police station with a friend.

### Gregory Had a Negative Attitude Toward Suicide

Gregory's mother testified that Gregory's best friend, Brynn Fletcher, committed suicide in 2010. Fletcher was also the husband of Gregory's sister and the father of their three children. Gregory's mother said that Gregory was very angry about Fletcher's suicide and called it a "chicken . . . way to go." Gregory told his mother that Fletcher's suicide had ruined his family.

### Appellant Never Arranges a Funeral for Gregory and Does Not Attend the Funeral Gregory's Family Arranged

Gregory's mother said she kept thinking that Appellant would call her to tell her what had happened to her son, but Appellant never contacted her. Gregory's mother said that she and her family waited to see what arrangements Appellant would make for his funeral services, but when they heard nothing from Appellant,

7

they went ahead and arranged funeral services on their own.  Appellant did not attend the funeral.

*Appellant Has Conversations with Her Son, Andrew, Regarding His Brother and Gregory's Ex-Wife that Cause Him Concern*

On October 14, 2011—the day after Gregory's death—Appellant told her son, Andrew, that someone had broken into the house, hit her, and shot Gregory. She claimed that the police would not let her leave the police station until she admitted shooting Gregory or admitted Gregory's death was a suicide.  She told Andrew that she made up the suicide story just so the police would release her. Andrew testified that he continued to believe her intruder story for several months and still believed it in June 2012 when he was called as a witness before the grand jury.

Andrew described Appellant's emotions during the two weeks following Gregory's death as "a big rollercoaster."  He said, "Some days she would be crying hard.  Other days she would be laughing."

Andrew said that several weeks after Gregory's death, he, his brother, and his sister's boyfriend went to the house to clean up the blood that was still in the carpet while Appellant packed up things in the kitchen.  While there, Appellant pulled him outside and told him that Kathy Williams (Gregory's former wife) had been talking to the media, so Appellant asked him to "call some friends and have them frame Kathy."  He described Appellant's demeanor when making the request as "[v]ery calm."  Specifically, she wanted some of his friends to pick up

8

an extra-large sweater, wear the sweater, fire a pistol into the sweater close enough to ensure gunpowder residue got on the sweater, break into Kathy's car in a manner that did not reveal it had been broken into, hide the sweater under the seat, and call 9-1-1 and leave an anonymous tip that would lead the police to search her car and find the sweater. Appellant insisted that she did not want Andrew to do it himself because she did not want him to get caught. Andrew said he was shocked at her request, but he attributed it to her having a mental breakdown. He told her he would take care of it, but he never called anyone. A week or two later, Appellant approached him and told him that since he had not taken care of the matter, she would figure it out on her own. She told him that she had gone to Wal-Mart and purchased two sweaters, an extra-large one and one her size. She explained that by buying one her size, she was able to pick up the extra-large one without leaving her DNA on it.

Later Andrew became concerned that Appellant was trying to put the blame of Gregory's death on his brother, Lee, so in January 2013, he called an investigator in the Tarrant County District Attorney's office to tell him about how Appellant had asked him to frame someone else. Andrew explained that in early 2012 Appellant and Lee had had an argument, and the next day Appellant asked him if he thought it was possible that Lee had killed Gregory. Andrew said that she was not joking and was serious, but he just attributed it to another mental breakdown, ignored it, and moved on.

When the detectives met with him, he told them about the various explanations Appellant had given regarding Gregory's death—an intruder did it, Kathy did it, or Lee possibly did it. Andrew told the detectives too how Appellant had also mentioned that Gregory had shown signs of contemplating suicide and had told him about how, a few days before Gregory's death, she had found the cars warm in the garage as if someone had left them running with the garage door closed. Appellant also told Andrew of a fight she and Gregory had on the night of his death and accused Gregory of throwing a tool at her face and causing a bruise.

*Appellant Appears on* 48 Hours

Appellant appeared on the television program *48 Hours*. Six short clips from her interview on *48 Hours* were played to the jury. In the first one, she told *48 Hours* that the intruder ran out the front door. In the second, she asserted that it was possible that a relative shot Gregory. In the third, she maintained that Gregory wanted a dominant woman, that Gregory wanted to be submissive at home because he was so dominant outside the home, and that whoever killed him was jealous and angry but not necessarily from the world in which Gregory was dominant. In the fourth, when confronted with the lack of any evidence of an intruder, she contended that the investigators were awful and missed a lot of evidence. In the fifth, with her voice cracking, she lamented how the real shooter was letting her take the blame. In the sixth, she explained how she thought the

10

intruder came into the house with his own gun but—for reasons she could not explain—used Gregory's gun that he kept under the nightstand next to the bed.

*Gregory's Life Was Insured for $800,000*

Gregory carried three separate life insurance policies. One was a $150,000 policy with the Gerber Life Insurance Company, acquired in August 2011, with M.W. named as the beneficiary. This policy had a suicide clause that negated the payment of any benefits if the insured committed suicide within two years of obtaining the policy. On the "Claimant's Statement," Appellant identified Gregory's cause of death as "Stated as Homicide."

The second was a $150,000 policy with the Garden Life Insurance Company acquired in May 2008 with Appellant designated as the beneficiary. It also had a two-year suicide clause.

The third was a $500,000 policy with Pavonia (formerly Household Life Insurance) acquired in January 2009 with Appellant designated as the beneficiary. Like the others, it had a two-year suicide clause.

*Medical Examiners Conclude Murder, Not Suicide*

Dr. Lloyd White conducted the autopsy on Gregory. As per Tarrant County Medical Examiner's Office protocol, Chief Medical Examiner Nizam Peerwani and the other deputy medical examiners peer-reviewed his autopsy. The examiners all concurred that the cause of Gregory's death was a gunshot wound to the head and that the manner of his death was a homicide.

11

Dr. White was no longer employed by the Tarrant County Medical Examiner's Office at the time of trial. His autopsy report was not introduced or admitted into evidence.

*The DNA Analyst*

Constance Patton, a DNA analyst, examined the handgun for the presence of blood; the hope was that the presence of blood from the blowback might indicate the distance of the shooting. She tested the gun barrel's inside, the gun barrel's outside, and the underneath part of the gun's frame. All her tests came back negative for blood.

*Firearm Examiner Determines the Gun Was More Than Six Inches Away from Gregory's Head When Fired*

Jamie Becker, a firearm and tool mark examiner, found no gunpowder residue on the comforter or blanket from Gregory's bed. She found gunshot residue on the pillowcases but no evidence of soot or burning. Becker explained that pillows were often used in an attempt to silence or muffle gunfire, so she looked for holes, burning, singeing, ripping, or tearing, but she did not find any signs of close-range firing. However, Becker also checked for stippling; stippling occurs when gunpowder strikes the skin, imbeds itself in the skin, and causes a slight abrasion. The slight abrasion cannot be wiped off or transferred. Stippling suggests the shooting distance was from an intermediate range. On the basis of stippling documented during the autopsy and, thereafter, range testing conducted using the firearm and ammunition similar to that identified in the case, Becker

12

was able to identify stippling patterns. Becker concluded that the gun muzzle was further than six inches but closer than twenty-four inches when fired. The gun barrel was five inches in length.

*Trace Examiner Finds Gunshot Residue on the Cuffs and Sleeves of Appellant's Jacket*

Vicki Hall, the trace examiner, did not find any characteristics of gunshot residue on the swabs from Appellant's hands. Its absence meant that Appellant did not fire the gun, the weapon involved was not one that left significant amounts of residue, or Appellant wiped or washed her hands before the sample was taken. Hall explained that even when gunshot residue is found on someone's hands, its presence does not indicate with certainty that the person fired a gun; rather, it could mean a number of things, such as the person fired the gun, the person's hands were near the gun when it was fired, or the person handled a firearm or a firearm component.

Gregory had gunshot residue on his hands. Therefore, this meant that he fired a firearm, his hands were close to a firearm at the time the firearm discharged, or he came in contact with a firearm or firearm component.

Hall also found gunshot residue on both cuffs and sleeves of Appellant's jacket. This meant that she was either wearing the jacket when she fired the gun, she was close to the gun when it discharged, she handled a firearm or firearm component, or she wiped the gun onto the jacket in some way.

13

*No Fingerprints on the Gun or Tools*

William Walker, the fingerprints examiner, found no fingerprints on the gun or the wrench usable for comparison or identification purposes. He found no fingerprints at all on the screwdriver.

*Financial Concerns*

Appellant was the bookkeeper for the Williamses. A forensic financial analyst testified that she saw indications of mismanagement—the type she saw frequently in economic crimes. A certified public accountant testified that the Williamses' finances were grossly mismanaged and that they "tended to be living beyond their means."

**FIRST POINT**

*Whether the Trial Court Erred by Admitting Appellant's Oral and Written Statements*

In her first point, Appellant contends that the trial court erred in admitting her oral and written statements into evidence in violation of (1) her constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, (2) her constitutional rights under section 9 of article I of the Texas constitution, and (3) article 38.23 of the Texas Code of Criminal Procedure. *See* U.S. Const. amends. IV, V, VI, XIV; Tex. Const. art. I, § 9; Tex. Code Crim. Proc. Ann. art. 38.23 (West 2005). She argues that she was a suspect in her husband's death from the very outset and that the assertion of the

14

police that she was a witness or a victim was nothing more than a charade and defies logic. She maintains that she was in custody from the moment the police took her to the stationhouse.

Additionally, even if Appellant was not in custody, she asserts that she requested an attorney at roughly 8:36 a.m., long before she admitted to tampering with the evidence and before she asserted that her husband had committed suicide. Appellant contends this rendered her oral and written statements after she requested counsel inadmissible.

The trial court made the following oral findings regarding the custody issue:

> THE COURT: Okay. The Court will find that on August [sic] the 13th of 2011, Sergeant McGrew and Officer Walsh/Todd responded to 1410 Jacob Avenue in the city of Keller, approximately 6:30 a.m.
>
> At that point, Officer Todd, having arrived first, made some of the initial contact with [Appellant] who was receiving medical attention. As Sergeant McGrew responded, he also made contact with [Appellant] who was receiving medical attention.
>
> And [Appellant] was then driven to the Keller Police Department by Sergeant McGrew and Officer Todd in Sergeant McGrew's car [and] was placed into an interview room. She was not a suspect at the time nor was [she] under arrest.
>
> And that continued until—up until the point that Sergeant McGrew then believed that there had been a crime committed, at which point he read [Appellant] her *Miranda* warnings. However, she did not wish to terminate the interview and continued on.
>
> At all points—at all times the suspect—[Appellant] was free to leave, was not under arrest, and as seen on . . . State's Pretrial 7, there were specific references that she was free to leave and people would be coming to get her. Sergeant McGrew specifically states, you are going home here today.

15

So the Court will find that [Appellant] was not in custody for the purposes of custodial interrogation as referred to as Article— under 38.22 of the Code of Criminal Procedure, and I will deny the motion to suppress.

The trial court did not make oral findings regarding whether Appellant invoked the right to counsel.

*Standard of Review*

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App.

16

2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

17

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

*Custody*

The United States Constitution commands that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. Constitutional and statutory protections are triggered when a person undergoes custodial interrogation. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612; *Herrera v. State*, 241 S.W.3d 520, 525–26 (Tex. Crim. App. 2007); Tex. Code Crim. Proc. art. 38.22 (West Supp. 2016). "Custodial interrogation" is the "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612; *Herrera*, 241 S.W.3d at 525. Article 38.22 of the code of criminal procedure also prohibits the use of statements that result from a custodial interrogation without compliance with its procedural safeguards. *See* Tex. Code Crim. Pro. Ann. art. 38.22.

Custodial interrogation occurs when law enforcement officers question a person after taking him into custody or depriving him of his freedom of action in any significant way. *Wilson v. State*, 442 S.W.3d 779, 784 (Tex. App.—Fort Worth 2014, pet. ref'd), *cert. denied*, 136 S. Ct. 86 (2015). A court must examine

18

all of the circumstances surrounding the interrogation when determining whether someone is in custody; however, the ultimate inquiry is simply whether there was a formal arrest or restraint on the freedom of movement of the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1529 (1994); *Estrada v. State*, 313 S.W.3d 274, 294 (Tex. Crim. App. 2010), *cert. denied*, 562 U.S. 1142 (2011); *Dowthitt v. State*, 931 S.W.2d 244, 254–55 (Tex. Crim. App. 1996).

Four scenarios wherein a person might be deemed in custody are: (1) when the person is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the person he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the person he is free to leave. *Dowthitt*, 931 S.W.2d at 255. Regarding the first through third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Id.* Regarding the fourth situation, the officers' knowledge of probable cause must be manifested to the suspect. *Id.* Such manifestation could occur if the officers relate information substantiating probable cause to the person or, conversely, if the person relates information substantiating probable cause to the officers. *Id.* Moreover, given the emphasis on probable cause as a factor in other cases, situation four does not

19

automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Id.*

A determination of whether a person is in custody must be based entirely on objective circumstances. *Id.* at 254. The subjective intent of either law enforcement or the defendant is irrelevant except to the extent manifested in the words or actions of law enforcement officials. *Id.* Finally, a defendant bears the initial burden of proving that her statement was the product of "custodial interrogation." *Herrera*, 241 S.W.3d at 526.

The evidence from the suppression hearing showed that Appellant voluntarily agreed to accompany Sergeant McGrew and Officer Todd to the police station. Appellant was not patted down, handcuffed, or otherwise restrained before she got into Sergeant McGrew's unmarked police car. Appellant was not placed under arrest. Both Sergeant McGrew and Officer Todd saw Appellant as a witness to the offense and as another victim of this home invasion/shooting rather than a suspect. Sergeant McGrew explained that he wanted to interview her as part of his fact-finding process.

Sergeant McGrew conducted his interview in the room used for witnesses and victims. Sergeant McGrew questioned Appellant about the events leading up to the shooting, including questions about who might possibly have had access to her house. Appellant took several breaks during her lengthy interview.

20

Sergeant McGrew said that Appellant was free to leave at any time and that if she had stood up and walked out, he would have let her. He denied telling her she was not free to leave, but he also denied expressly telling her she was free to leave. Sergeant McGrew made multiple attempts to arrange for someone to come and pick up Appellant. Appellant was not handcuffed or otherwise restrained during her interview. She was not told that she was in custody, under arrest, or not free to leave the police station. Appellant voluntarily agreed to write out a statement. Appellant wrote out her statement while she was alone in the interview room. Sergeant McGrew successfully found someone to come to the police station to pick up Appellant.

The trial judge reviewed the video interview. We have reviewed the video as well. The video begins at 6:41 a.m. Appellant spends about the first hour recounting how the intruder came into house, injured her, shot Gregory, and went out the bedroom door to the backyard. At 7:47 a.m., Sergeant McGrew informs Appellant that Gregory is dead, and Appellant cries uncontrollably. Appellant, however, agrees to continue to help the police capture the intruder.

For approximately the next hour and fifty minutes, Sergeant McGrew communicates to Appellant that the information that he is getting from the officers at the scene does not support what she had told him and that, based upon his experience, one of two things happened. Sergeant McGrew tells Appellant that either Gregory committed suicide and she tried to cover it up or that she killed Gregory. Appellant repeatedly denies either possibility, and at 9:42 a.m., she

21

puts her head down on the table and cries. Sergeant McGrew responds by stating that he will make one more phone call and then he would have someone come by to get her.

After Sergeant McGrew leaves the room, Appellant appears to mumble sobbingly, "I just want to leave." Officer Todd and Appellant then have a muted conversation about numbers they can call to have someone pick Appellant up. Appellant laments that she does not know where she can go, and Officer Todd tells Appellant that she cannot go home right now. In context, however, both Appellant and Officer Todd understood that Appellant could not go home because her home was a crime scene and because the police would not allow anyone to disturb it until after they had completed their investigation. When Appellant expresses concern that her car, keys, and wallet are all at the house, Officer Todd assures her that they will figure it all out and get it all taken care of.

When Sergeant McGrew returns to the room, he informs Appellant that the canine search showed that there were no intruders and, further, that there was no way "on God's green earth" that Gregory's death occurred in the manner she described. Sergeant McGrew tells Appellant categorically that either (1) Gregory shot himself, and she covered it up or (2) she killed him. Appellant then, in a voice broken with tears, spends the next ten minutes explaining how she covered up Gregory's suicide, after which Sergeant McGrew asks her if she wants him to call someone to come to be with her and asks her whom she wants him to call, and he agrees to make the calls.

22

When he returns, Sergeant McGrew informs Appellant that he was able to leave a message with her first preference. Appellant then relates in a more coherent fashion how Gregory committed suicide, how she panicked, and how she decided to make his death look like a burglary.

Sergeant McGrew then informs Appellant that he needs her to put her statement in writing, reads the *Miranda* rights to her, and tells her that she has committed the offense of tampering with evidence. He tells Appellant that she is not being arrested and charged with it, but because it is an offense, he has to read her rights to her. He informs her that he is again going to try to call her contact. Appellant then asks Sergeant McGrew if she is going to be arrested, and his immediate response is, "You're going home." Seconds later, he adds, "You're leaving today." Appellant then apologizes to Sergeant McGrew and says that she was only trying to protect M.W., and Sergeant McGrew responds that he understands that she was only trying to protect her family. Appellant then is left alone to write her written statement. Around thirteen minutes later, Sergeant McGrew returns to the room and informs Appellant that he has called her contact, that her contact will be there in about thirty minutes, and that he has told her contact that once she is done, she will be free to go.

The interview occurred in a room with no windows, the door shut, and at a table with Sergeant McGrew and Officer Todd. In light of the record of the assurances that Appellant was not being arrested and was being released to go home, being interviewed in a room with no windows, with the door shut, and in

23

close proximity to two police officers are not necessarily circumstances rising to the degree associated with a formal arrest. *See Wilson*, 442 S.W.3d at 784. Throughout the interview, Sergeant McGrew and Officer Todd treated Appellant as a woman who had just lost her husband. Officer Todd can be seen periodically holding Appellant's hands and patting her on the back.

Objectively, the video shows that Sergeant McGrew is initially skeptical about an intruder and, as the interview progresses and as he receives additional information from the officers at the scene, he openly expresses his disbelief in Appellant's story about an intruder. Sergeant McGrew also openly expresses his belief that either Gregory committed suicide and "somebody" covered it up or that Appellant killed him. Sergeant McGrew was effectively stating that he saw Appellant as a suspect of a crime, but he did not know which one. However, neither being the focus of a criminal investigation nor being questioned at a police station, without more, made the interview a custodial interrogation. *Id.*

Overall, Sergeant McGrew appears to suspect that Appellant covered up Gregory's suicide, and once she admits that, he makes no effort to push the matter further. Even after she admits tampering with the scene, Sergeant McGrew makes it clear that she will be going home.

Appellant complains that by taking her cell phone, the police isolated her. During the video, Appellant tells Sergeant McGrew that there was blood on her cell phone. Objectively, this might explain why the police took her cell phone. The absence of her cell phone became a problem only for purposes of finding

24

someone to come pick her up, but Sergeant McGrew was able to call her requested contact anyway.

We hold that the trial court did not abuse its discretion by finding that Appellant was never taken into custody and was not deprived of her freedom of action in any significant way. *See id.* Under the circumstances, the trial court could have reasonably concluded that an objectively reasonable person would not have believed that her freedom of movement was restrained to the degree associated with a formal arrest. *See id.* at 781–87 (holding that voluntary interview did not become custodial when detective asserted defendant would be charged with an offense or when defendant admitted accidental penetration of a child's sexual organ; holding custody occurred when detective told the defendant he was under arrest); *Hodson v. State*, 350 S.W.3d 169, 174–75 (Tex. App.—San Antonio 2011, pet. ref'd) (holding defendant was not in custody during sixty-minute interview when he admitted involvement in murder and noting that situations where the manifestation of probable cause triggers custody are unusual); *Houston v. State*, 185 S.W.3d 917, 921 (Tex. App.—Austin 2006, pet. ref'd) (explaining that although "there was probable cause to arrest and the strength of the State's case was readily apparent to all," detectives specifically told defendant that he was not under arrest and implied though their questioning that he could leave); *Scott v. State*, 165 S.W.3d 27, 42 (Tex. App.—Austin 2005) ("Although probable cause to arrest arose early in the questioning, the officers

25

never suggested by word or deed that [the defendant] was not free to leave."), *rev'd on other grounds*, 227 S.W.3d 670 (Tex. Crim. App. 2007).

*Request for Counsel*

Appellant contends that at roughly 8:36 a.m. during the interview, she invoked her right to counsel by stating, "I need a lawyer, obviously." Appellant asserts that this request was made well before she stated that Gregory committed suicide and that she tampered with the evidence. Because her oral and written statements admitting tampering with the evidence came later, she contends that the trial court should have sustained her motion to suppress.

The factual determinations of whether Appellant reasonably believed she was not free to leave or whether a reasonable person would have believed she was free to leave at the time she now claims she requested a lawyer turn on the interpretation of the events captured by visual and audio recordings. The trial judge was in the unique position of being able to watch and listen to the actual actions and words of the officers and of Appellant.

As we have previously explained, the law is well settled that we must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *Stevens*, 235 S.W.3d at 740; *Armendariz*, 123 S.W.3d at 404. Because the record may be understood in a manner to support the trial court's rulings, we are compelled to hold that Appellant was not in custody and, therefore, not subjected to custodial interrogation at the time she made her oral

26

and written statements. Although she was free to walk out of the police station and the officers would have had to allow her to leave unimpeded, the police officers were not obligated to accede to any request for a lawyer at the time she suggested she might need a lawyer. At that point, because the record reflects she was free to leave, even if she had unambiguously requested counsel, Sergeant McGrew could have ignored her request and proceeded. *See State v. Howard*, 378 S.W.3d 535, 540–41 (Tex. App.—Fort Worth 2012, pet. ref'd). After the officers provided her *Miranda* warnings, she neither requested counsel nor suspended the interview.

We overrule Appellant's first point.

## SECOND POINT

*Whether the Evidence Supports the Murder Conviction*

In her second point, Appellant contends that the guilty verdict for murder was not supported by (a) the autopsy because the police department impermissibly tainted the alleged crime scene and (b) the ballistic testing because the testing was skewed. Appellant cites one authority in her second point, and she cites that authority to set out the standard of review of a sufficiency-of-the-evidence challenge. *See Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014). We construe her second issue to be a sufficiency challenge and will treat it accordingly. Appellant's second issue attacks only the murder conviction.

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* at 319, 99 S. Ct. at 2789; *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray*, 457 S.W.3d at 448. We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct

28

evidence in establishing guilt. *Dobbs*, 434 S.W.3d at 170; *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

Appellant acknowledges in her brief that defense counsel at trial did a thorough job of presenting to the jury the deficiencies of the evidence gathering and the ballistic testing. Appellant writes:

> Without diverging into an extended discussion about the veracity of the autopsy itself, Appellant contends that there were multiple errors or scientific inadequacies in the collection of the evidence, the ballistic testing of the weapon in question, and in the autopsy conducted by Dr. White, all of which tainted the jury's ability to reach a verdict. Trial counsel did a very thorough job in highlighting these issues, and the bottom line is that the findings of a homicide, as opposed to a suicide were impermissibly contaminated by the improper procedures in gathering the evidence and the flawed ballistic testing of the alleged murder weapon that followed.

In other words, the jury was aware of the complained-of deficiencies but convicted Appellant anyway. It was the jury's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Murray*, 457 S.W.3d at 448. The jury was within its prerogative to find the autopsy and ballistic testing reliable notwithstanding any deficiencies or that any deficiencies were immaterial given the other evidence. We will not re-evaluate the weight of the evidence and credibility of the witnesses and substitute our judgment for that of the factfinder. *See Montgomery*, 369 S.W.3d at 192.

There was testimony that Gregory was against suicide because his best friend had committed suicide only a year earlier, leaving Gregory's sister a widow

and her three children fatherless. Gregory was also excited about the new house he and Appellant were buying. On the video, Appellant herself told Sergeant McGrew that they were closing on their house the next day and that Gregory was excited about it. Although there was evidence that Appellant and Gregory were living beyond their means, whether Gregory knew about their financial condition was not clear. The jury could have concluded that Appellant, however, as their bookkeeper, knew of the financial strains.

Regarding the wound, Dr. Peerwani testified, "I think that based on the photographs that it's clearly not a contact gunshot wound. It is not a loose contact gunshot wound. It's a range that we describe as intermediate range, a range beyond which there is no muzzle imprint left on the body surface." Dr. Peerwani testified that the vast majority of suicides involve a tight or loose contact gunshot wound. He acknowledged that suicides could sometimes involve intermediate gunshot wounds.

The record reflects that Appellant made no efforts to arrange funeral services for Gregory. When Gregory's family arranged funeral services, Appellant did not attend. During the interview with Sergeant McGrew only hours after Gregory had been shot in the head but before Sergeant McGrew had announced his death, when Sergeant McGrew asked her to describe Gregory,

30

she responded, "An asshole."  Although Appellant maintained that there were no issues between Gregory and her, the jury was free to believe otherwise.[4]

An insurance policy for $150,000 was taken out on Gregory's life only one month before he was killed; however, it had a two-year suicide clause in it. Appellant admitted that she had attempted to stage the crime scene to reflect a burglary during which an alleged intruder had killed Gregory.  She even struck her own face with a large wrench, leaving a large swelling.[5]  When her attempts to create a scenario of a burglary by a stranger failed, Appellant took steps to frame Gregory's ex-wife for his murder.  Appellant's son, Andrew, was concerned that she was also considering trying to frame his brother, Lee, for Gregory's murder.  The evidence showed that Appellant, notwithstanding that she had signed a written statement acknowledging Gregory committed suicide, thereafter submitted a "Claimant's Statement" on the policy and identified his cause of death as murder.  The jury was within its prerogatives to believe Appellant killed Gregory to recover the $150,000 life insurance.

Viewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found the essential elements of the offense of

---

[4]After Appellant gave her written statement and while she and Sergeant McGrew chatted during the wait for her ride, Sergeant McGrew told Appellant that she was a terrible liar.

[5]In the video, she lamented to Sergeant McGrew that she ended up striking herself too hard.

murder beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. We overrule Appellant's second point.

## THIRD POINT

*Whether the Trial Court Violated Her Right to Confrontation by Allowing a Medical Examiner Who Had Not Performed the Autopsy to Testify*

In her third point, Appellant argues that the trial court violated her right to confrontation under the Sixth Amendment of the United States Constitution and section 10 of article I of the Texas constitution by allowing Dr. Peerwani to testify. Appellant filed a pretrial motion to exclude Dr. Peerwani, the chief medical examiner, or any deputy medical examiner from testifying about Gregory's autopsy or his cause of death. She alleged that any such testimony violated the Confrontation Clause because neither Dr. Peerwani nor any other deputy medical examiner conducted Gregory's autopsy. The trial court denied her motion. After conducting a hearing on Appellant's motion to reconsider, the trial court again denied her confrontation objection.

A trial court's decision to admit evidence is reviewed under an abuse of discretion standard. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). However, if the admission of evidence involves a constitutional legal ruling, such as whether a statement is testimonial or non-testimonial, the appellate court gives almost total deference to the trial court's

determination of historical facts but reviews *de novo* the trial court's application of the law to those facts. *Wall*, 184 S.W.3d at 742 (applying hybrid standard of review to issue of whether statement was testimonial).

The Confrontation Clause of the Sixth Amendment guarantees the accused the right to confront the witnesses against him. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 1068 (1965); *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 483 (2015); *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013). "Testimonial" statements are inadmissible at trial unless the witness who made them either takes the stand to be cross-examined or is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 54, 124 S. Ct. 1354, 1365–66 (2004); *Burch*, 401 S.W.3d at 636. "Testimonial" statements include those statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. *Crawford*, 541 U.S. at 52, 124 S. Ct. at 1364; *Paredes*, 462 S.W.3d at 514.

Autopsy reports are testimonial where an objective medical examiner would reasonably believe that his report would be used in a later prosecution. *Lee v. State*, 418 S.W.3d 892, 896 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *Wood v. State*, 299 S.W.3d 200, 209–10 (Tex. App.—Austin 2009, pet. ref'd). However, an expert may disclose facts from the report of an autopsy conducted by another person if the expert relied on those facts in coming to his

33

or her own conclusions. *Williams v. Illinois*, 132 S. Ct. 2221, 2228 (2012); *Lee*, 418 S.W.3d at 898–99.

Furthermore, photographs taken during an autopsy are not statements. *Wood*, 299 S.W.3d at 214; Tex. R. Evid. 801(a). Thus, autopsy photographs are nontestimonial in nature for confrontation purposes. *Herrera v. State*, 367 S.W.3d 762, 773 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Wood*, 299 S.W.3d at 214.

Dr. Peerwani did not sponsor Dr. White's autopsy report and did not act as a surrogate for Dr. White. Instead, Dr. Peerwani presented his own opinion regarding the cause and manner of Gregory's death based on his independent review of the autopsy report, autopsy photographs, and toxicology reports, along with his expertise gained from conducting numerous autopsies. Dr. Peerwani's conclusions did not violate Appellant's confrontation rights. *See Edwards v. State*, No. 01-14-00384-CR, 2015 WL 1544512, at *6–7 (Tex. App.—Houston [1st Dist.] Apr. 2, 2015, no pet.) (mem. op., not designated for publication) (holding medical examiner may give conclusions based on review and analysis of autopsy photographs where examiner did not sponsor report); *Williams v. State*, No. 09-12-00350-CR, 2014 WL 1102004, at *3 (Tex. App.—Beaumont Mar. 19, 2014, pet. ref'd) (mem. op., not designated for publication) (holding medical examiner may give opinion regarding cause of death where based on independent review of entire autopsy file including autopsy report by non-testifying expert, photographs, and microscopic slides; testifying expert may use

34

autopsy report to explain the basis of her opinion even though autopsy report not admitted); *Hernandez v. State*, No. 05-11-01300-CR, 2013 WL 1282260, at *6 (Tex. App.—Dallas Mar. 6, 2013, pet. ref'd) (not designated for publication) (holding medical examiner may give conclusion reached after independently reviewing the autopsy report, photographs, and scene investigative history where he participated in peer review of autopsy report; testifying expert may not be used to introduce autopsy report prepared by non-testifying expert).

In particular, Dr. Peerwani's testimony addressing the manner and cause of Gregory's death did not violate Appellant's confrontation rights. *See Hutcherson v. State*, 373 S.W.3d 179, 183–84 (Tex. App.—Amarillo 2012, pet. ref'd) (holding medical examiner may give opinion regarding cause of death even though he did not perform autopsy; State may not offer autopsy report prepared by non-testifying expert); *Gilstrap v. State*, No. 04-09-00609-CR, 2011 WL 192688, at *1–2 (Tex. App.—San Antonio Jan. 12, 2011, pet. ref'd) (mem. op., not designated for publication) (holding medical examiner may rely on autopsy report prepared by non-testifying expert in reaching his independent conclusion concerning cause of death). Dr. Peerwani's testimony was based on his own observations, conclusions, and expertise. Thus, the trial court did not abuse its discretion by denying Appellant's motion and allowing Dr. Peerwani to give his opinion regarding the cause and manner of Gregory's death.

We overrule Appellant's third point.

## CONCLUSION

Having overruled Appellant's three points, we affirm the trial court's judgments.


/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

PUBLISH

DELIVERED: December 22, 2016