**AFFIRMED and Opinion Filed October 12, 2020**



**In the**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-19-00760-CR**

**CHRISTOPHER DAMON HARRELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 59th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. 068720**

## OPINION

Before Justices Whitehill, Osborne, and Carlyle
Opinion by Justice Carlyle

A jury convicted Christopher Harrell of murder and sentenced him to life in

prison. He complains the trial court allowed a Confrontation Clause violation and

erred by denying his motion for a new trial based on a *Brady*[1] violation. We affirm.

### Background

Michael Lindsey went missing. His daughter, Natasha Briggs, alerted police

and gave them his phone number. Officer Sam Boyle investigated, first using phone

geolocation data obtained from Mr. Lindsey's cell phone provider. Armed with

---

[1] *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

geolocation data describing Mr. Lindsey's phone's whereabouts and a description of his truck, Officer Boyle found and spoke to a man sitting in Mr. Lindsey's truck. The man said he was Mr. Lindsey and provided Lindsey's driver's license as his own. The man had a black ponytail and otherwise explained away his difference in appearance from the photo as due to drug use. The man also explained having been in a fight with his sister, and suspected she'd called the police on him; he accurately described the days of the week Mr. Lindsey had off from his job; and explained items in the bed of the truck as part of a move he was making from Denison to Sherman. While talking to the man, Officer Boyle called the number he had for Mr. Lindsey's phone, and the phone in the man's pocket rang.

Officer Boyle reported back to Ms. Briggs that he had found her father, but when Boyle described the interaction, Ms. Briggs immediately knew the man was not her father. Her dad had no sister. He wore his hair in a crew cut, not a ponytail. He took specific medication daily, and Ms. Briggs had separately verified it was still at his residence, making the reference to moving suspicious to her. Officer Boyle showed Ms. Briggs a photo of the man in her dad's truck from his body camera and she indicated he was not her father. Officer Boyle later learned the man impersonating Mr. Lindsey was appellant Christopher Harrell. Boyle used geolocation data from Mr. Lindsey's phone a few days later to track Mr. Harrell to a motel in Mt. Pleasant, where police detained him. He was the same man Officer Boyle interacted with previously.

Detective Brandon Hughes interviewed Mr. Harrell on October 1, 2017. Mr. Harrell said he was housesitting for Tina Moon while she was in Mexico from September 1 to September 28. He invited Mr. Lindsey and another man named Tracy to shoot pool at Ms. Moon's house on September 27. He said Tracy and Mr. Lindsey were arguing, like they often did, and he eventually went to a different part of the house to "hook up" with a woman. According to Mr. Harrell, he found Mr. Lindsey's body the next day when he was cleaning the house.

Mr. Harrell's version of events changed over the course of the interview. He later said that, rather than going to a different part of the house to hook up with a woman, he'd left to go get Amy Jones, a woman he was seeing who lived nearby. While he and Ms. Jones were walking back to Ms. Moon's house, he stopped to go into a convenience store and told her to walk back without him. He claimed he did not see her again until the next day. When he got back to Ms. Moon's house, he said he went upstairs, took methamphetamine alone, and tried to get some sleep. He got up the next day, went downstairs, and found Mr. Lindsey's body.

Mr. Harrell described the area of the home where he found the body and, although he claimed he did not know how Mr. Lindsey died, he said he suspected Tracy was involved. He said he covered the body with a shower curtain out of respect for Mr. Lindsey, and fled the scene because he did not want to be there when Ms. Moon, whom he described as his best friend, returned and realized he had betrayed her trust.

Mr. Harrell was a poor housesitter: he had been busy forging checks on Ms. Moon's account and stole many of her things, which he first said he loaded in Mr. Lindsey's truck before fleeing. He claimed to have presented himself as Mr. Lindsey to Officer Boyle because he knew he was already in trouble for using Mr. Lindsey's bank card and told Detective Hughes there was a .22-caliber handgun in his motel room.

After the interview, police searched Ms. Moon's house and found Mr. Lindsey's body right where Mr. Harrell said it would be. Although Ms. Moon had reported items missing from her home upon her return from Mexico on September 28, neither she nor the police responding to her report discovered Mr. Lindsey's body. That said, Mr. Lindsey's body was concealed, stuffed behind a door panel and underneath a table in a bathroom on the home's lower level. It was wrapped in a sheet and a shower curtain, with a brown towel covering a beaten face and a bath mat covering the bloody torso.

In addition to Mr. Lindsey's body, officers found three spent .22-caliber shell casings—two in the bathroom near where they found Mr. Lindsey's body and another in an adjacent bedroom—as well as a projectile lodged in a baseboard. They found a pillow with a bullet defect, numerous cigarette butts, and bottles of tequila, vodka, and whiskey. Forensic testimony indicated Mr. Harrell's DNA was present on the cigarette butts, and investigators found only Mr. Harrell's and Ms. Moon's

prints on the bottles. Mr. Harrell and his houseguests left behind a plastic bottle of scotch and a box of cheap cigarillos.

The medical examiner's office performed an autopsy on October 2. Although Dr. Chester Gwin signed the autopsy report as a peer reviewer, he did not perform the autopsy. He testified at the trial because the doctor who performed the autopsy was unavailable. Based on his review of the autopsy file, Dr. Gwin testified Mr. Lindsey suffered two gunshot wounds to the back of the right upper arm with the bullets penetrating his chest cavity. Mr. Lindsey also suffered multiple skull fractures resulting from blunt-force trauma to the head and face. Because a brown cloth fiber was embedded in Mr. Lindsey's fractured skull, Dr. Gwin opined it was very likely there was a cloth over his head at the time of the fracture. He further opined that Mr. Lindsey's death was a homicide resulting from the two gunshot wounds, with the blunt-force injuries as a contributing factor.

Police executed a search warrant on Mr. Harrell's Mt. Pleasant motel room and found a .22-caliber Ruger pistol that, according to forensic testimony at the trial, matched the shell casings found at the scene of the murder. The search also yielded numerous items belonging both to Ms. Moon and Mr. Lindsey, including Mr. Lindsey's driver's license, insurance card, social security card, checkbook, credit cards, and debit cards.

Detectives interviewed Mr. Harrell again on October 10. He told them he'd last seen Mr. Lindsey on the night of September 27, before he left to go get Ms.

Jones. But detectives confronted Mr. Harrell with pictures taken from an ATM machine on September 28, showing Mr. Lindsey alive and with Mr. Harrell at 7:37 that morning. They told him they also had evidence linking the gun found in his motel room to Mr. Lindsey's death. Mr. Harrell pivoted.

He then told detectives that after he and Mr. Lindsey came back from the bank that morning, he went upstairs to get high while Ms. Jones and Mr. Lindsey were downstairs. He said he came downstairs and saw Ms. Jones pointing the gun at Mr. Lindsey. She shot him twice before Mr. Harrell could restrain her.

According to Mr. Harrell, Mr. Lindsey was still alive after Ms. Jones shot him, but he said he knew Mr. Lindsey was going to die anyway, so he wanted to "end it." He said he grabbed a rock from outside, put a towel over Mr. Lindsey's face, and hit him in the head with the rock. Mr. Lindsey was still breathing even after the rock-to-skull treatment Mr. Harrell gave him, so, he said, Ms. Jones picked up the rock and hit him again. Mr. Harrell told detectives where to find the rock he used to hit Mr. Lindsey. Police later recovered a large rock from that location.

Mr. Harrell claimed to have cleaned the floor with cleaning supplies he found under the sink and tried to hide the body. He said he found the gun sitting in Ms. Moon's kitchen and grabbed it before he left. He admitted carrying the gun around the house on previous occasions, confirmed by a photograph Ms. Jones took of Mr. Harrell holding the gun that was admitted at trial. Mr. Harrell said Ms. Jones asked him to take the photograph because she wanted to use it to scare someone who owed

them money. When detectives asked Mr. Harrell about the pillow they found at the crime scene, he explained that Ms. Jones shot it when she was showing him how to use the gun on the day they took the picture. Mr. Harrell said he did not know why Ms. Jones shot Mr. Lindsey.

After his second interview, Mr. Harrell asked to speak with the Texas Ranger assigned to his case, which turned out to be Brad Oliver. Mr. Harrell told Ranger Oliver he previously lied to investigators, stating: "I gave them names from everything from Amy to -- and just names that started popping in my head . . . . To Tracy to whoever else." He added that he was "not past fabricating to preserve [his] own life."

Mr. Harrell told Ranger Oliver he didn't actually hit Mr. Lindsey with the rock but missed intentionally because he was being held at gunpoint. He addressed the photograph of him with the gun, and now claimed it was to promote his artwork, which he said he had on display "up and down Main Street."

And despite having previously denied a sexual relationship with Mr. Lindsey, Mr. Harrell reticently divulged that he and Mr. Lindsey were lovers. He claimed they "had been watching porn all night" and that he was performing oral sex on Mr. Lindsey when the killer came down and shot at them both. He said he was holding a pillow at the time, and the killer shot the pillow while trying to shoot at them. Mr. Harrell refused to identify the killer, saying it would have to wait until the trial, but let slip that he loved "the person that killed Michael [Lindsey]." He then held forth

at length on aspects of religion and philosophy, from creation and original sin to death and all its troubling finality.

Ms. Jones's trial testimony differed from Mr. Harrell's stories. She said she was romantically involved with Mr. Harrell in the weeks leading up to the murder and stayed with him at Ms. Moon's house on several occasions while he was housesitting. She said Mr. Harrell kept the gun in the back of his pants, and confirmed that he asked her to take the picture of him holding the gun so he could scare someone with it. She said she held the gun one time at Mr. Harrell's request, just to see how heavy it was, and claimed but scant experience with guns. She said she was not there when Mr. Lindsey died, and had nothing to do with his death.

At the trial, Mr. Harrell changed his story again. He testified he gave Officer Boyle Mr. Lindsey's driver's license and insurance card only to prove Mr. Lindsey's truck was registered and insured. He insisted he also gave Officer Boyle his own identification card.

He testified that he and Mr. Lindsey were shooting pool at Ms. Moon's house on the night of September 27. He left to pick up Ms. Jones, stopped at a convenience store, and told her to walk back without him. When he got back to the house, there were a lot of people there drinking and on drugs. He said Mr. Lindsey was arguing with someone over an alleged drug debt, and some of the men at the house that night were connected to a dangerous motorcycle gang.

According to Mr. Harrell, a group of those men, communicating with walkie-talkies, forced him at gunpoint to drive Mr. Lindsey to the ATM to withdraw money on the morning of September 28. When he and Mr. Lindsey returned to Ms. Moon's house, they were both drunk and "jacked up" on methamphetamine. Mr. Lindsey started swinging a pool hose like a lasso and hit himself in the head with the "large galvanized-type" hose coupling that "probably weigh[ed] twenty pounds easily." Mr. Lindsey was bleeding and falling all over, so they cleaned him up, covered his head with a brown towel, and laid him on the bed.

At some point after that, he was performing oral sex on Mr. Lindsey when two people came in with "rubber masks on, like monster masks." He thought they were probably associated with motorcycles based on the way they were dressed. He also heard others in the background, including a person who sounded like Ms. Jones. When one of them pulled out a gun and started shooting, Mr. Harrell ran away and hid in the attic. He smoked half a cigarette and put it out "on the rafter so the insulation wouldn't burn." He heard more gunshots—six in total, three louder than the other three. He said he had long suffered from anxiety and was so anxious he "shut down" and fell into a sleep-like state laying "on them hard-ass rafters," which he added were "like 16 inches apart, 22, I don't know."

Eventually—"it might have been 30 seconds, it might have been 30 minutes, I don't know, I don't know"—he came down from the attic and found Mr. Lindsey "scrunched up," on the ground, dead in the bathroom. He said Mr. Lindsey's body

was already lying on a sheet, so he wrapped it around him, put a brown towel over his face, covered his body with a shower curtain, moved the white door panel by the table, and left.

Despite previously telling investigators he packed Ms. Moon's items into Mr. Lindsey's truck himself, intending to sell them or use them to furnish his own place, he testified he and Mr. Lindsey put only a few items in the truck. He said he assumed the killers packed the rest, but then could not take the truck because he had the keys in his pocket. He said he later found the gun in the truck when he was looking for some of his own belongings and added that "there's all kind of Tina [Moon]'s clothes and shoes in there and a bunch of her jewelry." Ranger Oliver recalled that the truck was meticulously packed and that Mr. Harrell told him he wasn't above lying to save his own life. Ranger Oliver's testimony, when combined with Mr. Harrell's prior stories to investigators and his differing trial testimony about the items in the truck, betrayed that Mr. Harrell, having taken over the hoard of Ms. Moon's things, "knew the place of the least ring."[2]

Mr. Harrell admitted he lied to investigators about knowing who killed Mr. Lindsey and about hitting him with a rock, saying he told them what they wanted to hear so he could end their interrogations. Mr. Harrell refused to answer any of the

---

[2] *See* J.R.R. Tolkien, *The Adventures of Tom Bombadil*, "The Hoard" (1962), a poem telling the story of successive owners of a mound of treasure, relating the ill that befell each owner.

State's questions on cross examination.[3] The jury convicted Mr. Harrell of murder as charged and sentenced him to life in prison.

**We discern no Confrontation Clause violation.**

In his first issue, Mr. Harrell contends the trial court erred by admitting the autopsy report and by allowing Dr. Gwin, who did not perform the autopsy, to introduce testimonial statements in violation of his rights under the Confrontation Clause. *See* U.S. CONST. amends. VI, XIV. We review constitutional legal rulings de novo, including whether an out-of-court statement is testimonial in violation of the Confrontation Clause. *See Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

The Confrontation Clause prohibits the admission of testimonial statements by a non-testifying declarant unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 68–69 (2004). Where, as here, an objective medical examiner would reasonably

---

[3] Mr. Harrell later explained that he refused to answer the prosecutor's questions due to a potentially bizarre event at the jail where he was held during trial. Video captured the prosecutor visiting the area where Mr. Harrell was held during a lunch break in the trial. Video also captured what Mr. Harrell characterized as the prosecutor making his fingers into a gun pointed at him. Video captured the prosecutor walking Amy Jones, who was held in the jail due to her failure to appear to testify pursuant to a subpoena, directly in front of Mr. Harrell's cell and, on the prosecutor's way out, video shows what Mr. Harrell characterizes as the prosecutor giving "celebratory fist bumps" to "two bystanders." Ms. Jones testified that afternoon at the trial.

Mr. Harrell's trial counsel raised this issue during trial and the prosecutor explained that "the man gave me a deuce sign and I gave him a what's up sign." The court correctly admonished the prosecutor to "follow decorum" and instructed "the prosecution and anybody associated with the prosecution to not communicate with the defendant without defendant's counsel present."

Mr. Harrell raises no appellate issue regarding this event.

believe an autopsy report would be used in a prosecution, the report is testimonial for purposes of the Confrontation Clause. *Henriquez v. State*, 580 S.W.3d 421, 427 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd); *Williams v. State*, 513 S.W.3d 619, 637 (Tex. App.—Fort Worth 2016, pet. ref'd). Autopsy photographs, however, are generally not considered testimonial statements subject to the Confrontation Clause. *Williams*, 513 S.W.3d at 637; *Herrera v. State*, 367 S.W.3d 762, 773 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

The State appropriately concedes the autopsy report is testimonial and that admitting it into evidence violated the Confrontation Clause, *see Henriquez*, 580 S.W.3d at 428–29, but argues (1) Mr. Harrell appeals based only on Dr. Gwin's testimony—not the autopsy report—and (2) evidence from the autopsy report via Dr. Gwin at trial did not harm Mr. Harrell.

We must first determine whether Mr. Harrell has properly raised the issue of admitting the autopsy report for our review because we cannot reverse on an issue not properly raised. *See State v. Bailey*, 201 S.W.3d 739, 744 (Tex. Crim. App. 2006). Mr. Harrell's first issue heading does not specifically mention the autopsy report, but he complains broadly that his "right to confrontation was violated when a medical examiner who did not conduct the autopsy was allowed to testify regarding the results of the autopsy." The State introduced the autopsy report through Dr. Gwin's authenticating testimony. In determining whether an issue is preserved for our review, we "should consider the parties' arguments supporting each point of error

and not merely the wording of the points." *Anderson v. Gilbert*, 897 S.W.2d 783, 784 (Tex. 1995); *see St. John Missionary Baptist Church v. Flakes*, 595 S.W.3d 211, 214 (Tex. 2020) ("We have often held that a party sufficiently preserves an issue for review by arguing the issue's substance, even if the party does not call the issue by name.").

Mr. Harrell has sufficiently preserved the issue because he specifically challenges the autopsy report's admission in his brief with citation to the record and appropriate authorities, and because his issue "fairly include[s]" whether admitting the autopsy report through Dr. Gwin's testimony violated the Confrontation Clause. *See* TEX. R. APP. P. 38.1(f), 38.9; *St. John Missionary Baptist Church*, 595 S.W.3d at 214; *Anderson*, 897 S.W.2d at 784.

We next consider whether admitting Dr. Gwin's testimony was a Confrontation Clause violation. Although medical examiners may not serve as surrogates for introducing testimonial statements from autopsy reports they did not prepare, they may offer their own observations and conclusions drawn from an independent review of an autopsy file. *See Hernandez v. State*, No. 05-11-01300-CR, 2013 WL 1282260, at *6 (Tex. App.—Dallas Mar. 6, 2013, pet. ref'd) (mem. op., not designated for publication); *Williams*, 513 S.W.3d at 637–38; *see also Paredes v. State*, 462 S.W.3d 510, 517–18 (Tex. Crim. App. 2015) (distinguishing between impermissible surrogate testimony and independent expert testimony in the context of DNA evidence).

–13–

Dr. Gwin testified he conducted an independent review of Mr. Lindsey's autopsy file. He explained Mr. Lindsey's injuries by referring to the autopsy photographs, and provided his own opinions concerning both the cause of Mr. Lindsey's death and the manner in which Mr. Lindsey likely suffered his blunt-force injuries.

Although Mr. Harrell contends Dr. Gwin's testimony did not rise to providing his own independent observations and conclusions, he identifies no specific statements Dr. Gwin conveyed from the autopsy report to the jurors, as opposed to statements based on the autopsy photographs. He specifically complains only that the probative value of Dr. Gwin's disclosure of otherwise inadmissible facts or data underlying his opinion is outweighed by its prejudicial effect, the danger that jurors used these facts for impermissible purposes. *See* TEX. R. EVID. 705(d).

Having reviewed the record, we conclude that any of Dr. Gwin's testimony that arguably mirrored autopsy report statements was cumulative of or derivable from other evidence in the record, including the autopsy photographs, the crime-scene photographs, and other witness testimony. And, Mr. Harrell had and took the full opportunity to cross-examine Dr. Gwin at the trial. *See Hernandez*, 2013 WL 1282260, at *6; *Lee v. State*, 418 S.W.3d 892, 899 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).[4] For these reasons, Dr. Gwin's independent expert opinion

---

[4] We note that Mr. Harrell elicited other statements from Dr. Gwin on cross-examination, which he cannot rely on to support a Confrontation Clause violation. *See Williams v. State*, No. 09-12-00350-CR,

testimony did not violate the Confrontation Clause by relaying testimonial statements from the autopsy report.

We next consider the autopsy report. Because we agree with the parties that the trial court committed constitutional error by admitting the autopsy report, a document prepared to relay the results of an autopsy performed in a police-suspected homicide, *Henriquez*, 580 S.W.3d at 427, we cannot affirm unless we are convinced beyond a reasonable doubt that the error did not contribute to Mr. Harrell's conviction. TEX. R. APP. P. 44.2(a); *Scott v. State*, 227 S.W.3d 670, 690–91 (Tex. Crim. App. 2007). In making that determination, we must ask "whether there is a reasonable possibility that" admitting the autopsy report "moved the jury from a state of non-persuasion to one of persuasion on a particular issue." *Scott*, 227 S.W.3d at 690. Factors relevant to our analysis include: (1) the autopsy report's importance to the State's case; (2) whether the report is cumulative of other evidence; (3) whether there is evidence corroborating or contradicting the material statements in the autopsy report; (4) the strength of the State's case; (5) "the source and nature of the error"; (6) the extent to which the State emphasized the autopsy report; and (7) the weight the jury may have given the autopsy report "compared to the balance of the evidence [on] the element or defensive issue to which it is relevant." *Id.*

---

2014 WL 1102004, at *4 (Tex. App.—Beaumont Mar. 19, 2014, pet. ref'd) (mem. op., not designated for publication) (citing *Prystash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999)).

Here, the autopsy report was relatively unimportant to the State's case, the State did not emphasize it, and the report's material facts and conclusions were cumulative of other corroborating evidence. This case was about whether Mr. Harrell murdered his friend Mr. Lindsey at all, not some nuance in the manner of his death that could exculpate Mr. Harrell. Mr. Harrell was charged not only as a principal but as a party to the murder, and the exact manner of death was not determinative of either theory in this case.[5]

Dr. Gwin's testimony, autopsy photographs, crime-scene photographs, and other testimony established: (1) Mr. Lindsey was shot twice; (2) the bullets entered the back of his arm and lodged in his chest; (3) he suffered significant blunt-force injuries to his head and face; (4) he died from his injuries; and (5) his death was a homicide. Mr. Harrell did not contest any of those facts or conclusions at the trial. *See Marshall v. State*, 210 S.W.3d 618, 629 (Tex. Crim. App. 2006) (concluding any error in admitting autopsy report was harmless where cause of death was undisputed and "the victim's autopsy report had no bearing on the central issue in the case which was whether appellant was the one who shot the victim"); *Gonzalez v. State*, No. 05-13-00630-CR, 2014 WL 3736208, at *10 (Tex. App.—Dallas July 14, 2014, no pet.) (mem. op., not designated for publication) (concluding autopsy testimony was harmless where relevant issues were uncontested); *Hernandez*, 2013 WL 1282260,

---

[5] And the jury was only asked to answer whether he was guilty of murder, and not under which theory, which included a principal theory and an aiding-and-abetting theory.

at *7 (same); *Henriquez*, 580 S.W.3d at 429 ("The written autopsy report itself . . . adds little beyond the autopsy photographs and Dr. Hopson's testimony, both of which were properly admitted and did not implicate the Confrontation Clause."); *Lee*, 418 S.W.3d at 901 (concluding autopsy report was harmless where cause of death was uncontested and the report was cumulative of independent testimony based on the autopsy file).

Mr. Harrell contends admitting the autopsy report was harmful because it conflicted with Dr. Gwin's testimony concerning the cause of Mr. Lindsey's death. Although Dr. Gwin agreed with the autopsy report's conclusion that Mr. Lindsey died from his gunshot wounds, Dr. Gwin went beyond the report to opine that Mr. Lindsey's blunt-force injuries were a contributing factor. Even if we find a conflict between those conclusions, Mr. Harrell does not explain why allowing evidence creating the conflict, which would allow him an argument undermining the credibility of the State's evidence, could have made his conviction more likely.

If anything, admitting the autopsy report helped Mr. Harrell by allowing him to challenge Dr. Gwin's testimony and credibility in a manner that otherwise would have been unavailable. In fact, Mr. Harrell's counsel used the conflict he now claims is harmful during his cross-examination of Dr. Gwin. Further, to the extent the autopsy report undermined Dr. Gwin's conclusions about the significance of Mr. Lindsey's blunt-force injuries, it mitigated the most damaging of Mr. Harrell's recanted confessions—that Mr. Lindsey died after Mr. Harrell hit him in the head

with a rock, seeking to "end it." We see no reasonable possibility that admitting the autopsy report "moved the jury from a state of non-persuasion to one of persuasion on a particular issue" of consequence to Mr. Harrell's conviction. *See Scott*, 227 S.W.3d at 690; *Lee*, 418 S.W.3d at 899.

We overrule Mr. Harrell's first issue.

## There was no *Brady* violation.

In his second issue, Mr. Harrell contends the trial court erred by denying his motion for new trial because the State violated his rights under *Brady v. Maryland*. He bases this argument on the State's post-trial disclosure that Officer Boyle's report incorrectly stated the phone police pinged to track him to Mt. Pleasant was *his phone*, instead of Mr. Lindsey's phone. Mr. Harrell contends the State deprived him of the opportunity to cross-examine Officer Boyle on this inconsistency and that it could have led jurors to give his testimony less credibility, therefore "the probable cause for the appellant's arrest, the resulting interrogation and searches would have all been in question[] and could have changed the outcome of the trial." We disagree.

In his report, Officer Boyle stated that geolocation data he obtained from *Mr. Harrell's* phone indicated he was in Mt. Pleasant on October 1, but, per the post-trial disclosure, the geolocation data actually came from *Mr. Lindsey's* phone. At a post-trial hearing to supplement the record, Officer Boyle testified he referred to the phone as Mr. Harrell's in his report because he knew Mr. Harrell possessed it at the time, but he clarified Mr. Harrell did not actually own the phone. He said he brought

that distinction to the State's attention approximately a week before the trial. Mr. Harrell's motion for a new trial was denied by operation of law.

Because Mr. Harrell raised this alleged *Brady* violation in a motion for a new trial, we review the trial court's ruling for abuse of discretion. *See Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). Under this standard, we view the evidence in the light most favorable to the ruling and will reverse only if no reasonable view of the record could support it. *Id.*

Prosecutors must seek justice before victory because they represent the sovereign, whose interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). Prosecutors have an obligation under *Brady* "to assist the defense in making its case." *United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985). This is a "limited departure from a pure adversary model," one where the Constitution imposes a duty on prosecutors to disclose to the defense pretrial—and with sufficient time for the defense to make effective use of—information that is "favorable to an accused . . . [and] material either to guilt or to punishment." *Brady*, 373 U.S. at 87; *see Little v. State*, 991 S.W.2d 864, 867 (Tex. Crim. App. 1999) (timing of disclosure). An "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf" in the case, "including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

To determine whether the State, through its representatives in the trial court, has violated its *Brady* obligations, we consider: (1) whether the information in question is favorable to the accused, either because it is exculpatory or impeaching; (2) whether the State possessed and suppressed the information either willfully or inadvertently; and (3) whether the information was material, meaning whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing cases); *Little*, 991 S.W.2d at 866.

At trial, Detective Hughes testified, before Officer Boyle testified and was cross-examined, that "it was Mr. Lindsey's phone that was geolocated in Mount Pleasant." At the lunch break after Detective Hughes's trial testimony, the trial court highlighted the statement's inconsistency with earlier information from suppression hearings. The prosecutor indicated the State was "looking into" the matter, and had been in light of those pre-trial hearings. The State indicated it expected to have an answer before trial was over. Defense counsel was present for this discussion and at the suppression hearings. Defense counsel did not cross-examine on or otherwise seek to impeach Detective Hughes as to whose phone police pinged.

Officer Boyle testified that afternoon, after Detective Hughes's trial testimony, that he got Mr. Lindsey's phone number from his daughter when she reported her father missing, and that it was this phone number police had the phone company use to geolocate the phone. Again, despite being armed with the

information, defense counsel chose not to ask Officer Boyle a single question about the inconsistency between his testimony and his report.

The State suppressed the information at least inadvertently. The issue arose in suppression hearings a month before trial; the trial court raised the issue during trial, after Detective Hughes testified; the State indicated it was looking into the issue at that time; post-trial testimony indicated members of the prosecution team told prosecutors about the inconsistency pre-trial, that the State sought further information from the phone company, and that it received confirmation during trial that the phone was Mr. Lindsey's and not Mr. Harrell's. The State failed in its pre-trial duty to inform Mr. Harrell of the inconsistency in Officer Boyle's report. *See Strickler*, 527 U.S. at 281–82.

The information was favorable to Mr. Harrell because it could have been used to impeach Officer Boyle's credibility and as part of the defense's broader quest to discredit and question the State's investigation. *See id.* at 282.

But we conclude there was no *Brady* violation because the information was not material. There is no reasonable probability that disclosure would have changed the result of the proceeding. *See id.* at 280 (citing cases). Impeaching Officer Boyle on the point that he listed the phone as belonging to Mr. Harrell instead of Mr. Lindsey would have proved little. Even in concert with the other "sloppy investigation" arguments trial counsel was able to make, this error would not have changed the result. One indication fortifying our conclusion is trial counsel's choice

not to cross-examine Officer Boyle or Detective Hughes on the point even though the issue had been raised in prior hearings, by that day's testimony, and by the court.[6]

We also reject Mr. Harrell's suggestion that the disclosure could have unraveled probable cause, putting the "resulting interrogation and searches" into question. Trial courts have discretion to make decisions based on conflicting facts when deciding motions to suppress, and thus even had the trial court been faced with a disclosure that the report listed the wrong owner, the court would have been well within its discretion to deny the motion. *See Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex. Crim. App. 1997). Indeed, the trial court brought the parties back for a hearing two days after sentencing to "correct the record" and at the beginning of the recorded portion of the hearing, the court mentioned bringing the witnesses back because of the prior motion to suppress. Officer Boyle's and Ranger Oliver's testimony at that hearing served to explain the inconsistency in light of a subpoena return from the phone company the prosecution team received during trial.

Juries are empowered to resolve factual inconsistencies, *see Jones v. State*, 936 S.W.2d 678, 680 (Tex. App.—Dallas 1996, no pet.), and the jury did so here, armed with the very information Mr. Harrell now complains he lacked, though

---

[6] Mr. Harrell doesn't make an untimely disclosure argument, perhaps because his focus is on the official State disclosure that occurred only the day after sentencing. But to the extent the argument is "fairly included" in this issue, TEX. R. APP. P. 38.1(f), we reject it as a basis for reversal because the information is not material. *See Strickler*, 527 U.S. at 280.

without the same spotlight he now claims he would have shone. Even with the spotlight of cross-examining the witnesses about the difference in which phone police pinged, we conclude there is no reasonable probability the outcome would have been different with timely disclosure. Thus, the information was not material. *See Strickler*, 527 U.S. at 281. We overrule Mr. Harrell's second issue.

\*　　\*　　\*

Having overruled both of Mr. Harrell's issues, we affirm.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

Publish
TEX. R. APP. P. 47.2(b)
190760F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CHRISTOPHER DAMON HARRELL, Appellant

No. 05-19-00760-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 59th Judicial District Court, Grayson County, Texas

Trial Court Cause No. 068720. Opinion delivered by Justice Carlyle. Justices Whitehill and Osborne participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 12th day of October, 2020.