

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-21-00156-CR

———————————————————

CRAIG ALAN VANDEWEGE, Appellant

V.

THE STATE OF TEXAS

On Appeal from 372nd District Court
Tarrant County, Texas
Trial Court No. 1481312D

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

On the morning of December 15, 2016, Shanna Vandewege and three-month-old Diederik Vandewege were murdered. Their throats were slit. Shanna was still in bed. Diederik was still in his bassinet.

A jury found Appellant Craig Alan Vandewege guilty of capital murder by intentionally or knowingly causing the death of Shanna and Diederik during the same criminal transaction or by intentionally or knowingly causing the death of Diederik, an individual under ten years of age. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A), (8). Because the State waived the death penalty, the trial court sentenced Vandewege to life in prison without parole. *See id.* § 12.31(a)(2).

On appeal, Vandewege brings two points. First, he contends that the evidence is insufficient to support the verdict. Second, he asserts that the trial court abused its discretion by admitting statements that he had purportedly made to a coworker because their prejudicial value substantially outweighed their probative value.

We hold that the evidence is sufficient to support Vandewege's conviction and that the trial court did not abuse its discretion by admitting Vandewege's statements to a coworker. We overrule both points and affirm the trial court's judgment.

# I. EVIDENCE

## A. VANDEWEGE AND SHANNA'S RELATIONSHIP

### 1. Vandewege's Parents

Vandewege met his future wife, Shanna, on the dating site Christian Mingle. From Vandewege's parents' perspective, it was true love. His father testified, "They were in love. You know, they were meant for each other." His mother added, "[T]hey were very much in love." Photographs of Vandewege and Shanna together corroborated his parents' observations.

### 2. Vandewege's Coworkers

Vandewege's coworkers, however, saw something quite different. One coworker said that Vandewege made "mean, nasty comments" about Shanna; the coworker added, "I mean it was constant." Another coworker said that Vandewege made derogatory comments about Shanna on almost a daily basis.

Vandewege's former supervisor testified that Vandewege spoke so negatively about Shanna that she questioned why Vandewege was dating her. Even before Vandewege married Shanna, the supervisor had advised Vandewege not to marry her because he spoke so poorly of her. The supervisor explained that Vandewege was "just always talking bad about her." The supervisor's impression was that Vandewege went through with the marriage for financial reasons.

### 3. Financial Matters

Other evidence supported Vandewege's supervisor's impression that Vandewege had married Shanna for financial reasons.

Vandewege and Shanna procured their marriage license on May 2, 2014. On the very next day, May 3, 2014, Vandewege created a living trust. A forensic financial analyst testified that a living trust was one means of protecting assets in the event of a divorce. The analyst noted that Vandewege had placed his house and his checking account in his living trust. Vandewege also had his payroll checks deposited into the living trust. In contrast, Shanna's payroll checks were deposited into the couple's joint checking account. The couple married later in May 2014.

Additionally, the analyst determined that when Shanna sold her house, she made a $65,000 profit. This $65,000 was then used to pay down the mortgage on Vandewege's house, which, as noted earlier, had been placed in Vandewege's living trust. The analyst questioned if Shanna was aware that she would never get that $65,000 back.

Shanna had life-insurance policies in the approximate amount of $43,000 before she married Vandewege. Shanna made Vandewege the beneficiary of those policies.

The life insurance did not stop there. One month after Vandewege and Shanna were married, Vandewege took out another $220,736 in life insurance on Shanna.

Between Shanna's and Vandewege's policies, Shanna's life was insured for a total of approximately $265,000.

And in 2016, Vandewege purchased another $396,500 in life insurance on Shanna to bring the total to $661,505. Shanna was murdered in December 2016.

Vandewege had also taken out life-insurance policies on Diederik. Two days after Diederik's birth in September 2016, Vandewege took out policies on him in the amount of $56,500. As next of kin, Vandewege would have been the beneficiary of those policies.[1]

## B. VANDEWEGE AND DIEDERIK'S RELATIONSHIP

### 1. Vandewege's Parents

Regarding Diederik, Vandewege's mother stated that Vandewege and Shanna were excited about Diederik because they had previously lost a baby. Photographs seem to show Vandewege to be a happy father.

---

[1]Shanna's father testified that on the day Diederik was brought home, he overheard Vandewege on the telephone talking to someone, after which Vandewege commented to Shanna, "I guess we can only get $10,000 of life insurance on [Diederik] until he's three months." Vandewege purchased a basic life-insurance policy for $1,500, a supplemental life-insurance policy for $5,000, and an accidental-death-and-dismemberment policy for $50,000. A forensic financial analyst stated that accidental-death-and-dismemberment insurance is "generally for people who have a high-risk job or [who] have a high-risk lifestyle and [who have other] people rely[ing] on them financially for support."

5

## 2. Vandewege's Coworkers

Vandewege's coworkers, however, expressed reservations about Vandewege and his relationship with Diederik. When an ultrasound suggested that Diederik might have physical abnormalities, one coworker described Vandewege as "[j]ust kind of disgusted." And the same coworker commented that when it was determined that Diederik had a tongue tie, Vandewege recounted how he put numbing gel in Diederik's mouth and cut the ligament himself to avoid a $15 copay.[2]

### C. COMMENTS FORETELLING VIOLENCE

In the months preceding the murders, Vandewege had made comments that others thought odd. After the fact, the comments appeared to foreshadow the murders. For example, a coworker said that Vandewege had told her about a dream he had in which he had cut Shanna's head like bologna. This same coworker related that while Shanna was pregnant, Vandewege said that "he wished he could just push her down the stairs and kill her."

Vandewege made a similar comment to a second coworker: Vandewege stated that he would get time off from work and life insurance money if Shanna fell or was pushed down the stairs while pregnant and lost the baby. To this coworker,

---

[2]When asked if Vandewege was frugal, Vandewege's father responded, "Very, yes. He watched his money." Vandewege's second point is based on the testimony concerning Vandewege's personally cutting the tongue tie to avoid the $15 copay.

6

Vandewege also said that he needed life insurance in case Shanna died during childbirth.

Vandewege's comments were not limited to coworkers. Vandewege told Shanna's childhood friend that he would be set for life if Shanna died. A last example involved Shanna's brother, Mitchell. At Thanksgiving 2016, when exchanging goodbyes, Mitchell said that he would see them again for Christmas; Vandewege scoffed and responded, "That's if you get to see her again." Mitchell said that the comment angered him to the point that he wanted to hit Vandewege, but Mitchell and Shanna's father intervened to defuse the situation.

### D. THE MURDERS AND THE AFTERMATH

Shanna and Diederik were murdered between 12:30 a.m. and 1:30 p.m. on December 15, 2016.[3] Vandewege was scheduled to work from 11:30 a.m. until 9:00 p.m. Google data showed that Vandewege was at or very near the crime scene from 11:00 p.m. on December 14, 2016, until about 10:56 a.m. on December 15, 2016.

Vandewege arrived at work about forty-five minutes late. He was described as "disheveled." While at work that day, Vandewege told one of his coworkers that he was trying to text Shanna, but she was not answering. When the coworker was asked

---

[3]Based on the rigor in Shanna's body, a medical doctor testified that Shanna was killed any time after 12:30 a.m. and before 1:30 p.m. on December 15, 2016. The doctor added that due to the degree of rigor in Shanna's body, the time of death became increasingly unlikely as the day progressed. Regarding the 12:30 a.m. starting point, Shanna's phone was last used at 12:35 a.m. on December 15, 2016. It was a forty-second call to Vandewege's phone.

7

if Vandewege was expressing concern, she responded, "No, just probably more irrita[tion]." Vandewege also told the coworker that he had purchased diamond earrings for Shanna. And, Vandewege went out of his way to show his supervisor a video of Diederik, which was something that he had never done before. Google data showed that Vandewege left work around 8:54 p.m.

When Vandewege returned home that night, at 9:28 p.m., he called 911 to report that Shanna and Diederik were dead and that his house was a mess and all torn up. The 911 dispatcher described him as "very calm," "eerily calm," and "nonchalant." The dispatcher, who had twenty-three years' experience, said that she "didn't notice any emotion." She added, "I did not hear him ask once what can I do to help, do I need to put a towel on the bleeding, do I need to check for wounds, do I need to check their pulse . . . . That's very typical -- in my experience very common." She continued, "So to me for a person to call and say somebody is injured and not once say what can I do to help, do I need to try to stop the bleeding, . . . , it was just bizarre to me." Vandewege did not ask that any medical help be sent to his house, and he did not express any concern about any perpetrators still being inside the house.

When the responding officer arrived, Vandewege greeted him on the front porch and said that his wife and child were dead. Vandewege explained to the officer that when he had arrived home from work, the front door was unlocked, all the cupboards in the kitchen were open, and the dogs were inside, which was "really weird," so he let them out. Vandewege related that when his wife did not respond to

8

his calls, he went upstairs where he found the door to the master bedroom closed. After entering, he discovered that someone had torn up the bedroom. Vandewege then said that he saw his wife in bed and the baby in the bassinet; both were all bloody.

When the officer entered the house, however, it was not what he had anticipated. Although untidy, the home had not been ransacked, and the television, which he would have expected to have been stolen, was still there. Every cabinet and drawer in the kitchen had been opened, but "[n]othing was rummaged through or ransacked."

Vandewege spoke with detectives on December 16, 2016, from about 1:18 a.m until about 6:43 a.m., after which—because he could not return to his home—he asked to be dropped off at his employer's place of business. Once there, Vandewege spoke with his direct supervisor about what had happened.

After Vandewege explained the events to his supervisor, his supervisor drove him to a hotel. The supervisor said that while they were in the car, Vandewege "volunteered how much his dog was going to miss his wife, that they had really bonded when his baby was born." Vandewege, per the supervisor, also said that "he was just really sad that the dogs were going to miss his wife a lot." The supervisor added that if Vandewege had ever cried, it was while he was discussing his dogs. Regarding Diederik, the supervisor observed that his conversation with Vandewege was noteworthy for what it was missing: "In this whole conversation[,] he never

9

mentioned his son. Never heard his son's name. Never mentioned him unless I asked."

After talking with Vandewege, the supervisor said that he was ninety percent sure that Vandewege was the murderer.

### E. ONE WEEK AFTER THE MURDERS

Shanna's and Diederik's funerals were scheduled for December 21 or 22, 2016, in Colorado. On December 22, 2016—a week after Shanna and Diederik were murdered—Vandewege posted on Facebook his plans for a Las Vegas vacation:

> Ok[,] so after taking a little drive and stopping at the local Chevy dealership[,] I told the [salesman] my life story[, and] he agreed to let me b[o]rrow a newer [C]orvette. He has all my guns and has Shanna . . . Vandewege[']s [E]lantra. I want to meet you all in [L]as Vegas at Trump Tower and ask [T]rump for a pardon in case lying dick face investigator convicts me. I feel the deck is stacked against me. I'm going to get 2k out of the bank and do some hookers and cocaine while one gives me a rim job. Maybe he will let me grab [someone] by the pussy. I love you all and God bless. God speed and balls deep! Yee yee[.]

Because Vandewege was absent, the funerals had to be rescheduled for December 27, 2016.

Also on December 22, 2016, the detective learned that Vandewege had been arrested in Colorado on an unrelated traffic violation. The detective then procured his own warrant for Vandewege's arrest.

The investigator[4] found the crime scene odd.  Neither the front door nor the backyard gate had been damaged.[5]  The lock to the back door had been jimmied.  The investigator said the more common method of gaining entry was to kick the door in, which took less time.  The investigator estimated that only one to five percent of the cases that he had worked on involved jimmying the lock to get inside.  The investigator opined that a burglar could have broken a glass pane in the back door, reached through the broken window, and unlocked the door from the interior.

The investigator noted that someone had pulled open the drawers in the kitchen, but he also observed that nothing had been removed.  Burglars, he commented, did not target kitchens because they "aren't trying to find dishes and stuff like that."  A purse on the kitchen counter had not been disturbed.  The investigator opined, "[T]hat would be an easy grab during a burglary" because "that's where a lot of women keep valuable items, credit cards, cash, stuff like that."

The investigator noted other peculiarities.  Televisions and gaming systems were typically what burglars took because they were easily marketable.  But in Vandewege's case, the flatscreen TV was still in the living room, and a television and

---

[4]The witness identified himself as a "home inspector."  For clarity, we refer to him as an investigator.

[5]Shanna's father testified that when he visited Shanna and Vandewege after Diederik's birth, the gate to the backyard had been padlocked.

gaming system in the game room had not been disturbed. Similarly, watches, a computer, and a cellular telephone were left behind. And in the bedroom, where the murders occurred, a jewelry box and a flatscreen television had not been disturbed.

A crime scene officer found a latex glove in Vandewege's car. Jurors later learned that on the glove was blood and that after the blood was analyzed for DNA, Diederik could not be excluded as its source.

Like the responding officer, the detective assigned to the case commented on the relative orderliness of a house that had been allegedly burglarized: "I thought it was pretty neat for a burglar, yes." When walking up the stairs to the bedroom, the detective saw a shotgun underneath the bed. And, in the upstairs closet was another firearm. The detective commented, "Well, typically firearms, and we're talking about burglaries, firearms are like gold. That's a high[-]dollar item that a burglar could get quite a bit of money for on the streets. They're not typically left behind."

Another oddity was the fact that Vandewege had two dogs and that both were indoors when the murders occurred. The detective said, "Well, it would just seem to be highly unusual to me that the dogs would just let somebody whittle on the back door without alerting . . . her, and let somebody get all the way in the house without alerting her." The detective said that he would have expected the dogs to bark or do something to wake up Shanna. An alerted person—the detective noted—could have rolled to the side of the bed and grabbed the shotgun. And, "[a]t the minimum," the detective would have expected a burglar to have put the dogs outside. But the

12

detective saw no signs of a struggle. "It looked like [Shanna and Diederik] were merely sleeping."[6]

The detective also determined that someone had cleaned up the bathroom after the murders. To the naked eye, blood was not visible. But with the help of Blue Star, a chemical that illuminated blood, the detective was able to see blood. To the detective, a burglar had no reason to clean up the bathroom; blood was already everywhere. The detective believed that someone who had wanted to hide the fact that the killer had gone into the bathroom to clean up would have gone to that trouble.

On the floor in the bedroom were two open safes. One required a key to open, and the other required a combination. Thus, the burglar would have been someone who knew where the key was to the one safe and what the combination was to the other safe.

The detective noted too that a burglar would have had no incentive to kill Diederik. A three-month-old child could not testify as a witness.

---

[6]A crime-scene reconstruction expert testified that, in her opinion, "Shanna was laying in her bed with her covers pulled up to her throat at the time that the injury was inflicted." She said it was possible that Shanna was asleep when she was attacked. Shanna had no defensive wounds on either arm.

## II. DISCUSSION

### A. SUFFICIENCY

In Vandewege's first point, he contends that there 'is no evidence that [he] killed his wife and son." The gist of Vandewege's argument is that there is no direct evidence showing that he murdered his wife and son and that the State's case was purely circumstantial.[7] Despite the evidence being circumstantial, we hold that it is nevertheless sufficient to support the verdict.

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App.

---

[7]Although Vandewege articulates his fist point as a legal-sufficiency complaint, the case law on which he relies is the defunct factual-sufficiency standard. *See Clewis v. State*, 922 S.W.2d 126, 135 (Tex. Crim. App. 1996), *overruled by Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We decline to use the factual-sufficiency standard because it is no longer deemed separate from legal sufficiency.

2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

In establishing guilt, circumstantial evidence is as probative as direct evidence, and circumstantial evidence alone can be sufficient. *Hammack v. State*, 622 S.W.3d 910, 914–15 (Tex. Crim. App. 2021). On appeal, the standard of review is the same for both circumstantial- and direct-evidence cases. *Id.* at 915.

Here, viewing the evidence in the light most favorable to the verdict, the evidence showed that Vandewege was quite capable of being duplicitous and that—even assuming that Shanna was aware of his living trust—he was financially exploitative. *See Williams v. State*, 513 S.W.3d 619, 634 (Tex. App.—Fort Worth 2016, pet. ref'd) (stating that evidence is viewed in the light most favorable to the verdict). Thus, a rational trier of fact could have reasonably concluded beyond a reasonable doubt that Vandewege purchased life insurance for Shanna and Diederik, killed them

15

for the proceeds, and then staged a burglary—in a clumsy manner that law enforcement quickly debunked—in an attempt to conceal the fact that he was the killer. *See id.* at 634–36. "Attempts to conceal incriminating evidence ... are probative of wrongful conduct and are also circumstances of guilt." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

We overrule Vandewege's first point.

## B. Admission of Testimony

In Vandewege's second point, he asserts that the trial court abused its discretion by admitting statements that he had purportedly made to a coworker that he had personally performed a medical procedure on Diederik to save himself the expense of a $15 copay. Vandewege contends that the prejudicial value of the evidence substantially outweighed its probative value.[8] *See* Tex. R. Evid. 403.

The exchange about which Vandewege complains follows:

---

[8]In Vandewege's brief, he complained specifically about comments that he had made to a coworker about Diederik because the conversation "implied ill-will towards his son." When quoting the reporter's record, however, Vandewege included other matters, after which the trial court ruled on both his objection regarding the comments that he had allegedly made regarding Diederik and on his objections regarding these other matters. In his brief, Vandewege does not complain about these other rulings. We do not understand his argument to encompass any of these other matters included in the quoted material. *See generally* Tex. R. App. P. 38.1(i) (requiring concise arguments with appropriate citations); *Bramlett v. State*, No. 06-11-00149-CR, 2012 WL 1537577, at *2 n.2 (Tex. App.—Texarkana May 2, 2012, pet. ref'd) (mem. op., not designated for publication) (declining to create arguments on the appellant's behalf).

Q.  After Diederik was born, did he tell you about a condition that Diederik had related to his tongue?

A.  Yes.  He said that the baby was tongue tied.

Q.  And what did you understand tongue tied to mean?

A.  That the tongue was -- there was an extra piece of skin under the tongue that would prevent or sometimes hinder things like feeding and that type of thing.

Q.  Did he tell you anything about himself and being tongue tied?

A.  He said that he had . . . the same thing.

Q.  Did he tell you about -- did he tell you that he did anything to correct that issue?

A.  He said he performed the procedure on the baby to release the tongue himself.  He did it himself.

Q.  And what did that involve?

A.  He said that he got the information from YouTube on how to do it and put some numbing gel on the baby and then whatever he used to do the procedure, I didn't ask.

Q.  But did he indicate what he did?

A.  He said he cut it.

Q.  So he told you that after putting numbing cream in Diederik's mouth that he cut the ligament under Diederik's tongue?

A.  Yes.

Q.  He didn't tell you the exact mechanism he used?

A.  No.

Q.  Did he tell you why he did this?

17

A. Because he wanted to save $15 from his copay on his insurance.

Q. $15 of a copay that his insurance would require?

A. Correct.

Q. So he told you that -- so his motivation that he told you was to avoid a $15 copay he performed this procedure himself?

A. He did.

Q. Otherwise a procedure that would have been performed by a doctor?

A. Yes.

Q. Under sterile circumstances?

A. Correct.

Q. Did you ask anything about -- did he tell you anything about Shanna's thoughts on this?

A. Well, the first thing I asked was if Shanna was okay with that, and he said, ["]No, not really but she finally agreed to it.["]

Q. What was your reaction to this?

A. I was floored.

Q. Why is that?

A. Because I think it's horrible to -- I can't imagine taking any kind of instrument to a tiny little baby's mouth and cutting it. It's just beyond something I would consider to be a normal practice.

Q. Did you find that entire conversation very upsetting?

A. Yes.

18

Q. What was his emotional demeanor?

A. He was just happy he saved his money.

Q. That he'd saved the $15?

A. Yeah.

Q. Do you recall approximately when he told you about that?

A. It was probably October. The baby was little.

Q. And we're talking about 2016, correct?

A. Yes.[9]

Later in the trial, a medical doctor commented on the risks a patient ran if someone other than a doctor performed the procedure: "General risks of any type of procedure that would involve cutting tissue would include bleeding, you could include infection, damaging other structures in the area." The doctor said that if the procedure was done incorrectly, it was possible to damage the mouth: "So you could actually cause more damage to the tongue or the salivary glands in the bottom of the mouth if you weren't trained to do one of the two common procedures that they do."

We agree that the testimony was prejudicial. But we disagree with Vandewege's underlying premise that it was unfairly prejudicial. The point of offering evidence is to injure the opponent's case. *See Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993); *Gomez v. State*, No. 02-17-00089-CR, 2018 WL 547626, at *2 n.3 (Tex. App.—

---

[9]Vandewege preserved his complaint at a preliminary hearing.

Fort Worth Jan. 25, 2018, no pet.) (mem. op., not designated for publication). "Unfair prejudice" refers to evidence that has an undue tendency to suggest a decision based on an improper basis—most commonly, but not necessarily, an emotional one. *Cohn*, 849 S.W.2d at 820.

The State was asking the jury to believe beyond a reasonable doubt that Vandewege slit the throat of his own three-month-old son. Normally, that would be a tall order to fill.

The disputed testimony went to Vandewege's state of mind. It provided a concrete example of his priorities. Despite the risks to Diederik, to save $15, Vandewege chose to forgo having a trained medical doctor perform the procedure. The $15 was more important than Diederik or his health.

We hold that the trial court did not abuse its discretion by admitting the disputed testimony. *See Cohn*, 849 S.W.2d at 820; *Gomez*, 2018 WL 547626, at *2 n.3. But assuming it did, we would nevertheless hold that the error was harmless. *See* Tex. R. App. P. 44.2(b). Other evidence illustrated Vandewege's callous attitude toward Diederick. For example, while Shanna was pregnant, Vandewege stated that he wanted to push her down the stairs. When discussing the murders with his supervisor, Vandewege did not mention Diederick. And instead of lamenting Shanna's and Diederick's deaths, Vandewege lamented the effect Shanna's death had on his dogs. Finally, we have reviewed the crime scene photographs. This testimony

20

about Vandewege snipping a ligament under Diederik's tongue was the least of Vandewege's concerns.

We overrule Vandewege's second point.

### III.  CONCLUSION

Having overruled Vandewege's two points, we affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  June 6, 2024